**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

| | |
|---|---|
| **ARIC COOPERWOOD**, **ANTHONY FELLOWS**, and **RACHEL FELLOWS**, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>**KDR AP, LLC**; **KDR REALTY, LLC**; **AXIOM PROPERTY MANAGEMENT, LLC**; **AXIOM PROPERTY MANAGEMENT II, LLC**; **AXIOM EQUITIES, LLC**; **AXIOM-ASPEN, LLC**; **AXIOM EQUITIES INVESTMENTS, LLC**; and **AXIOM FAMILY OF COMPANIES, LLC**,<br><br>        Defendants. | **Case No.: 2:25-CV-2267**<br><br>**CLASS-ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS-ACTION COMPLAINT**</u>

Plaintiffs Aric Cooperwood, Anthony Fellows, and Rachel Fellows, by and through the undersigned counsel, hereby submit this Class-Action Complaint for monetary damages on behalf of themselves and all others similarly situated. Plaintiffs aver, upon information and belief, as follows:

**INTRODUCTION**

1.      This case is primarily about the long-running neglect of multiple ownership and property-management entities to substantially invest in, and thereby repair, the decaying, unstable plumbing system at a residential apartment complex. The property at issue is the Aspen Place Apartments ("Aspen Place"), located at 101 Aspen Rd. in Gardner, KS, which was recently—finally—condemned by the City of Gardner owing to its persistent inability to supply its residents

with water. That condemnation resulted in a short-notice, intensely stressful mass displacement of Aspen Place residents, all of whom were suddenly compelled to find new places to stay after having already suffered the effects of negligent property management. A copy of the Notice of Unsafe/Unfit Structures giving a deadline of May 8, 2025 to vacate is found below:



2.      As alluded to above, the water lines at Aspen Place had presented significant long-term maintenance problems affecting the delivery of essential services to tenants (such as water) well before the condemnation. The municipality finally issued that judgment after a series of minor citations inappropriate to the magnitude of the deficiency. Of course, safe, clean water is essential to life and running water is among the most fundamental of habitability concerns; an apartment in which one cannot shower or bathe, wash dishes, boil water, obtain drinking water, or do laundry is effectively worthless in a reasonably competitive market. Naturally, the systemic water-related problems at Aspen Place, which were both realized and latent, were not disclosed to eventual residents before they entered their leases. Indeed, few, if any, would have entered leases had they been suitably apprised that the pipes running through the complex were liable to burst over Christmas; sewage was prone to back up in their market-rate apartment; or they may well find

themselves completely deprived of water and the entire complex condemned. However, those who benefited from their rents—ownership and property-management businesses—knew, or certainly should have known, for years that the plumbing infrastructure running throughout Aspen Place was in a dismal state, unsustainable, in need of investment, and thereby an avoidable disaster due to the long-running neglect of the property's water and plumbing systems.

## PARTIES

3.     Defendant KDR AP, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in February 2022; its entity number is 6958953; and its organizer was Puneet Gorawara. KDR AP, LLC's principal office address is 1711 N. 73rd Terr., Kansas City, KS 66112 and two members—Puneet and Aabha Gorawara—own 5% or more of its capital.

4.     Defendant KDR AP, LLC has also stated that its principal office address is 9633 Redbud Ln., Lenexa, KS 66220.

5.     Defendant KDR AP, LLC names itself as its own registered agent and its registered office as 1711 N. 73rd Terr., Kansas City, KS 66112; its registered-agent form was signed by Puneet Gorawara.

6.     As the nomenclature "AP" suggests, that entity was formed in 2022 to effect the purchase and ownership of Aspen Place.

7.      Defendant KDR Realty, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in March 2014; its entity number is 7695828; and its organizer was Puneet Gorawara. KDR Realty, LLC's principal office address is 1711 N. 73rd Terr., Kansas City, KS 66112 and two members—Puneet and Aabha Gorawara—own 5% or more of its capital.

8.        Defendant KDR Realty, LLC has also stated that its principal office address is 9633 Redbud Ln., Lenexa, KS 66220.

9.        Defendant KDR Realty, LLC names itself as its own registered agent and its registered office as 1711 N. 73rd Terr., Kansas City, KS 66112; its registered-agent form was signed by Puneet Gorawara.

10.        These two KDR Defendants will be collectively referred to herein, for the sake of convenience, as "KDR." It seems these and/or other KDR entities also do business as "KDR Group."

11.        KDR is the current owner and manager of Aspen Place, having purchased the property in 2022. Clearly, the two aforementioned entities are closely intertwined; they apparently comprise a family-run business. On information and belief, KDR's President, Puneet Gorawara, is married to its Vice President, Aabha Gorawara. Additionally, the Gorawaras apparently use their daughter—on information and belief, Gauri—to perform property-management services.

12.        Defendant Axiom Property Management, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in January 2011 and its entity number is 6499966. Axiom Property Management, LLC states that its principal office is located at 815 Woodswether Rd., Kansas City, MO 64105 and John Emanuels, Ben Kalny, and Randall Treas, located at that same address, are the three members that own 5% or more of the company's capital.

13.        Defendant Axiom Property Management, LLC can be served by serving its registered agent: DSD Service Corp., 9101 W. 110th St., Ste. 200, Overland Park, KS 66210.

14.         Defendant Axiom Property Management II, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in

December 2020 and its entity number is 9790767. Axiom Property Management II, LLC states that its principal office is located at 815 Woodswether Rd., Kansas City, MO 64105 and John Emanuels, Ben Kalny, Randall Treas, and Richard Stone are the four members that own 5% or more of the company's capital. Defendant Axiom Property Management II, LLC states that Messrs. Emanuels, Kalny, and Treas are located in Shawnee, KS, while Mr. Stone is located in Kansas City, MO.

15.     Defendant Axiom Property Management II, LLC can be served by serving its registered agent: DSD Service Corp., 9101 W. 110th St., Ste. 200, Overland Park, KS 66210.

16.     The two Axiom Property Management entities will herein be referred to, for the sake of convenience, as "Axiom Property Management."

17.     Per its Facebook page, Axiom Property Management stated in 2023 that it was based out of Kansas City and described itself as "an owner/operator" of over 20 properties in the area. Axiom Property Management was responsible for managing Aspen Place (at least) until the property was sold to KDR.

18.     Defendant Axiom Equities, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in August 2007 and its entity number is 6195648. Axiom Equities, LLC states that its principal office address is 815 Woodswether Rd., Kansas City, MO 64105 and names John Emanuels, Ben Kalny, and Randall Treas as the three members that own 5% or more of the company's capital. Axiom Equities, LLC further avers that Messrs. Emanuels, Kalny, and Treas are located at that same Kansas City, MO address. Axiom Equities, LLC was named as such in April 2008, which entailed a change from "Emanuels Group, LLC."

19.      Defendant Axiom Equities, LLC can be served by serving its registered agent: DSD Service Corp., 9101 W. 110th St., Ste. 200, Overland Park, KS 66210.

20.      Defendant Axiom Equities Investments, LLC is registered with the Kansas Secretary of State as a limited liability company; its articles of incorporation were executed in June 2020 and its entity number is 9663683. Axiom Equities Investments, LLC states that its principal office address is 815 Woodswether Rd., Kansas City, MO 64105 and names John Emanuels, Ben Kalny, Randall Treas, and Richard Stone as the four members that own 5% or more of the company's capital. Defendant Axiom Equities Investments, LLC states that Messrs. Emanuels, Kalny, and Treas are located in Shawnee and Lake Quivira, KS, while Mr. Stone is located in Parkville, MO.

21.      Defendant Axiom Equities Investments, LLC can be served by serving its registered agent: DSD Service Corp., 9101 W. 110th St., Ste. 200, Overland Park, KS 66210.

22.      Defendant Axiom Family of Companies, LLC was organized in November 2017 and its entity number is 8834749. Axiom Family of Companies, LLC states that its principal office address is 815 Woodswether Rd., Kansas City, MO 64105 and names John Emanuels, Ben Kalny, and Randall/Leslie Treas as the three members that own 5% or more of the company's capital. Defendant Axiom Family of Companies, LLC states that Mr. Emanuels, Mr. Kalny, and the Treases are located in Lake Quivira, KS.

23.      Defendant Axiom Family of Companies, LLC can be served by serving its registered agent: DSD Service Corp., 9101 W. 110th St., Ste. 200, Overland Park, KS 66210.

24.      Defendant Axiom-Aspen, LLC was dissolved in October 2022, presumably following the sale of Aspen Place to KDR. Axiom-Aspen, LLC was organized in June 2014, presumably to effect the purchase of Aspen Place; its entity number is 7795727. The members that

owned more than 5% of Axiom-Aspen, LLC's capital were Aspen Road Investors, LLC; the Tray F. Vedock Revocable Trust; Jim Wright; and Randy and Leslie Treas. Axiom-Aspen, LLC also used DSD Service Corp. as its registered agent.

25.    While Axiom-Aspen, LLC has been dissolved, it is properly included as a Defendant here because it owned some or all of Aspen Place during the proposed class period, amongst other considerations.

26.    These non-"Property Management" Axiom entities will be collectively referred to herein, for the sake of convenience, as merely "Axiom." Obviously, the Axiom entities named herein, both as to property management and ownership/investment, are closely related, with substantially overlapping membership and control. Discovery is required to determine the various entities' precise relationships vis-à-vis Aspen Place.

27.    Axiom owned Aspen Place until it was sold to KDR.

28.    Plaintiffs' counsel, via a letter dated May 9, 2025, expressly put KDR, Axiom, and Axiom Property Management on notice with respect to legal representation; intent to file this class action; the duty to preserve documents, information, tangible things, and ESI; and a cease-and-desist regarding the possible coercion of residents regarding their legal rights.

29.    Plaintiff Aric Cooperwood is a natural person, consumer, and citizen of Kansas.

30.    Plaintiff Anthony Fellows is a natural person, consumer, and citizen of Kansas.

31.    Plaintiff Rachel Fellows is a natural person, consumer, and citizen of Kansas.

## JURISDICTION & VENUE

32.    The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act, as (1) it is a proposed class action (likely comprising

thousands of class members); (2) members of the plaintiff class are citizens of a state different from that of some Defendants; and (3) the amount in controversy exceeds $5 million.[1]

33.     This Court has personal jurisdiction over all Defendants because, at the least, each registered to do business in Kansas and, in fact, routinely did/does business in Kansas, including with specific regard to the matters described herein. This Court has general personal jurisdiction over multiple Defendants because they are citizens of Kansas.

34.     Venue in this Court is proper because most, if not all, of the events giving rise to this dispute occurred in Kansas.

### FACTS COMMON TO ALL COUNTS

35.     The buildings comprising Aspen Place were constructed in 1954; the complex consists of 188 units.

36.     Despite offering 188 units, Aspen Place was not designed as a high-rise or complex of a few sizeable, multistory buildings. Rather, it entails a large number of duplex-like apartments; the reason for this atypical layout is that the buildings formerly housed soldiers stationed at a military base.

37.     Aspen Place offered one, two, three, and four-bedroom units until quite recently, when the residents were constructively and wrongfully evicted owing to a severe habitability concern: the aforementioned total, or near-total, lack of water.

---

[1] Due to the conditions at Aspen Place, Plaintiffs seek back rent for the class period (5 years). At a conservative $1,000.00 per month for each of the 188 units, this amounts to over $11,000,000 just in rent damages sought. Plaintiffs also seek damages for property, loss of use, emotional distress, civil penalties, attorneys' fees and expenses, and punitive damages.

38.       Per an article posted on May 7, 2025, Fox 4 News in Kansas City reported that the City of Gardner had finally condemned Aspen Place owing to "**significant safety concerns**" affecting 700 residents.[2]

39.       On or about May 8, 2025, those 700 residents were constructively and wrongfully evicted from their home due to the negligent maintenance of the water systems by Defendants. The City of Gardner apparently had knowledge of Aspen Place's water-related problems for an extended period of time.

40.       Per one quote in that article, attributed to a Matt Thrasher of Gardner, "The city's known that there was a good chance that anytime [] this place was going to go through this."

41.       Similarly, the mother of an Aspen Place resident decried the City of Gardner for turning a blind eye to the problems: "The city, they've known this has been going on for years, and all they've done is give them citation after citation . . . .".

42.       That article also attributed quotes from a written statement to Jeff Zimmerman, who, as an attorney for the "KDR Group," claimed that ownership had already decided to "completely overhaul" the complex's "aging water system" while implicitly laying blame on the municipality: "Keeping up with the aging water system became too much, so they decided to completely overhaul the system.  The timing of the City's condemnation was unfortunate when the City's firetruck collapsed the water line. This has become a monumental problem and we are working to figure out solutions and will work with the City and Community Groups who are also working on this."

---

[2] *See* FOX 4 NEWS, KANSAS CITY at https://fox4kc.com/news/700-residents-impacted-by-aspen-place-condemnation-in-gardner-kansas/(last visited May 15, 2025)(emphasis added).

43.    Despite Aspen Place's long-running and severe habitability issue(s), Mr. Zimmerman explained that KDR's remedy entailed the following measures: "We are working to figure out a system to refund the May rent that had already been paid by some of the Tenants and to inspect the units to release security deposits."

44.    Of course, given that the entire complex was *condemned* (effectively constructively and wrongfully evicting the tenants) owing to "significant safety concerns," residents who had already paid May rent were *legally entitled* to have that rent refunded. And, as described herein, they are entitled to more including loss of use of the property and loss of use of personal property.

45.    Completely overhauling the water system would have not only required that KDR commit to major affirmative expenditure but also forgo significant rental income.

46.    Discovery is required into KDR's capitalization and insurance, including as to whether it could have afforded to "completely overhaul" Aspen Place's water system and any plans it had developed in that respect.

47.    Plaintiff Aric Cooperwood entered a new lease with KDR on November 11, 2024 after having moved into the complex in December 2022. That lease was for the premises located at 178 Aspen St., Gardner, KS 66030. The term of that lease was January 9, 2025 through January 8, 2026.

48.    The lease stated that Mr. Cooperwood paid a $930.00 security deposit.

49.    The monthly charge under Mr. Cooperwood's lease was $1,063.00, including $10.50 for "liability to landlord insurance," and $4.50 for an "administrative fee" for that "liability to landlord insurance":[3]

---

[3] Taken from p.21 of Mr. Cooperwood's lease with KDR.

## 11.2 CHARGES

Resident(s) hereby agree to pay a mandatory monthly Landlord Liability Insurance Premium("LLIP") fees of ($10.50) per month, subject to no proration. This is an amount equal to the actual premium charge to the Lessor including any premium taxes and fees due to state governing bodies. Additionally, an Administration Fee in the amount of four dollars and fifty cents ($4.50) to be retained by the Lessor for processing and handling will be charged.

50.    While, as in this example, the lease's syntax and grammar is often vague and ambiguous, as well as objectively incorrect, it seems that KDR here unconscionably passed the cost of its own general-liability policy(ies) onto its tenants.

51.    Unsurprisingly, Mr. Cooperwood's lease contained any number of other unfair, if not unconscionable, as well as unclear, terms and charges. That is, while failing to reasonably provide an essential service, or services, KDR shamelessly nickel-and-dimed the Aspen Place tenants.

52.    Reading between the lines, the terms of Mr. Cooperwood's lease rendered it that much more evident that KDR *knew* the complex's water systems were a mess and passed the cost and responsibility therefor onto the tenants—e.g.:[4]

## 2.1 UTILITIES

The Tenant shall pay all utility charges when due and, in the event Tenant shall fail to pay said utility charges for any reason, Landlord may, at his option, pay such charges and collect the same from Tenant as additional rent, along with the late charge above stated. The heat must be left at the lowest heat seating if tenant moves out during winter months, the heat is NEVER to be turned off as frozen pipes will result. Tenant will be financially responsible for any water damages in case of frozen pipe.

53.    Putting aside the fact that "the lowest heat [setting]" is entirely vague, as is "any water damages in case of frozen pipe[s]," it is evident that KDR—which began charging tenants for utilities, including water, via a lease addendum beginning in late 2023—was well aware of the

---

[4] Taken from p.3 of Mr. Cooperwood's lease with KDR (highlights added).

systemic fragility and inadequacy of Aspen Place's plumbing and sought to make the residents culpable, through the most expansive and nebulous language, for its deficiencies.

54.    Likewise, KDR declared in the lease that, in addition to the usual sorts of *force majeure* considerations, it would not be responsible for "water overflow/leakage," mold, or "utility interruption[s]." These terms, in context, were unconscionable, if not overtly unlawful.

55.    And, despite these disclaimers and the fact that KDR charged tenants for the aforementioned "liability to landlord insurance," it further required lessees, via a Renter's Insurance Addendum, to purchase a "personal liability policy with, at a minimum, $100,000 limit" and add KDR as an insured while *also* making it that much more obvious that KDR was passing the cost of Aspen Place's plumbing issues on to the tenants:[5]

---

Aspen Place Office

101 Aspen St • Gardner, KS 66030
(913) 856-8185



## 11. Renter's Insurance Addendum

### 11.1  REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum replaces  Lease Apartment Section 3(h) in the Lease Agreement, which, in summary, requires Tenant to purchase a personal liability policy with, ==at minimum, a $100,000 limit==. It will be updated as follows :

This Addendum is attached to and becomes a part of the Lease Agreement as attached dated  11/11/2024 . For the duration of the Lease Agreement, Tenant(s) are required to maintain the following minimum required insurance coverage:

- $100,000 Limit of Liability for Tenant's legal liability for damage to Landlord's property for no less than the following causes of loss: fire, smoke, explosion, ==backup or overflow of sewer, drain or sump, and water damage ("Required Insurance").==

---

56.    So, per its leases with Plaintiffs and the proposed class members, KDR charged tenants every month for its own liability insurance *and* required them to purchase outsized liability policies with KDR as an insured, while making it evident that water-related problems were a primary concern, *and* while requiring tenants to pay the actual utility bills (via system dubbed "RUBS") while also failing to reliably supply water. KDR even began requiring tenants to pay a

---

[5] Taken from p.21 of Mr. Cooperwood's lease with KDR (highlights added).

"water-usage fee," which was itself based on the number of residents living in the complex, not a given tenant's actual "usage" of water. This, then, entailed another misrepresented and unconscionable pass-through of *some* cost to tenants by KDR.

57.    Robust discovery into KDR's insurance policies and practices is needed and justified, including with regard to its "Tenant Liability Insurance Program" and coverage arrangement with Great American E&S Insurance Co:[6]

## OPTION 2:

**Do nothing — you will automatically be enrolled in our Tenant Liability Insurance Program.**

This is an easy and low cost way to meet your lease requirement, but does not cover your personal belongings. You pay the monthly premium together with rent.
(Details below).

58.    Given the aforementioned lease terms, as well as KDR's absurdly inadequate property management, it appears to be in substantial part a kind of insurance arbitrage scheme.

59.    As to Plaintiff Cooperwood's experience as a resident at Aspen Place, he witnessed his rent increase while KDR also extracted the cost of utilities, including trash removal, from that cost, via, as stated, lease addendums. Additionally, these addendums were ostensibly added, at

---

[6] Taken from p.54 of Mr. Cooperwood's lease with KDR.

least in a number of cases, *during* lease terms, so as to constitute unconscionable contracts of adhesion.

60.     Mr. Cooperwood routinely encountered—roughly every few months—water-related problems during his tenancy at Aspen Place. These included, but were not limited to, unduly low water pressures, water-heater malfunctions, and a boil advisory from an apparent employee of Johnson County.

61.     On May 6, 2025, the City of Gardner posted a condemnation notice on the door of Mr. Cooperwood's unit, by which it declared it "**unfit for human occupancy**."

62.     Plaintiffs Anthony and Rachel Fellows, a married couple, lived at Aspen Place for approximately five years before finding themselves forced to vacate the premises because of the condemnation; they moved in during July 2020, when the complex was owned and managed by, respectively, Axiom and Axiom Property Management. The Fellowses also have two young children.

63.     The Fellowses experienced long-running water and pipe-related issues, including as to sewage and mold. For example, in 2023, they experienced persistent water outages for at least two weeks around Christmas. Then, in 2024, they experienced a week-long water outage around Easter.

64.     KDR was exceedingly slow to respond to burst pipes, while also leaving visible leaks unrepaired for months, which caused property damage. As described, KDR tactically used unconscionable insurance-related conditions and practices as a shield relative to its own property-management and ownership deficiencies.

65.    After KDR began utilizing the aforementioned, unconscionable "RUBS" system in late 2023, the Fellowses noted, unsurprisingly, that the water bills submitted by KDR were outsized, in the amount of approximately $80-100 per month for their family of four.

66.    Discovery is required into KDR's utility-related billing practices, including but not limited to inflation, manipulation, and/or misrepresentation of consumer water bills, both individually and relative to the complex as a whole, as there is good reason to believe that KDR not only failed to provide an essential service but also profited from that failure in excess of inflated rents—i.e., via illusory insurance and utility-billing practices.

67.    KDR demanded, unconscionably, that the Fellowses sign a new utility addendum following the water outage over Christmas 2023.

68.    Further, KDR engaged in deceitful, in addition to neglectful, property-management practices as it would mark maintenance requests "complete" despite having done nothing in that respect or, alternatively, simply leave such requests dangling in "contractor status" indefinitely.

69.    Yet further, the Fellowses encountered substantial mold and mildew issues, ostensibly as a result of pipe bursts and sustained leaking, as well as sewage backup. KDR simply never fixed a/the sewage drain that was malfunctioning just outside their unit.

70.    Remarkably, despite the Fellowses timely rent payments in the face of KDR's functionally nonexistent property management, it retaliated against them when, in January 2024, it rejected their lease-renewal application *because the Fellowses had left negative reviews about it online and Rachel Fellows had appeared in the news with respect to KDR's mismanagement*. **In order to have the application accepted, KDR compelled Ms. Fellows *to delete the negative reviews in its presence*.** Later, the Gorawara daughter also mocked Ms. Fellows about her appearance on the news. A/the property manager also quit shortly after that incident.

71.     While pipe-related problems clearly entailed the most severe and sustained habitability issues for the Fellowses, they also encountered problems with electrical wiring, which KDR neglected to fix.

72.     All the Plaintiffs have endured substantial emotional distress because of the issues complained of herein, including, but not limited to the mass constructive and/or wrongful eviction in May of 2025.

73.     All the Plaintiffs, as well as the putative class members, as defined below, have suffered financial injuries in the form of, non-exhaustively, inflated rent, insurance, utility payments, and/or loss of use of personal property.

### Axiom, KDR, and the Sale of Aspen Place

74.     Axiom maintains a website that introduces its aforementioned members/principals/owners: John Emanuels, Ben Kalny, Randy Treas, and Richard Stone.[7]

75.     With regard to management and capitalization, Axiom holds itself out as being well-financed and well-managed, including with "committed on-site teams [that] manage each property daily to ensure the success of each property."[8]

76.     Axiom sold Aspen Place to KDR in 2022.

77.     On information and belief, Axiom sold Aspen Place to KDR because it realized that the property would continue to require outsized maintenance expenditures, thereby eating into profitability. The sale price was, on information and belief, approximately $9 million—i.e., less

---

[7] *See* AXIOM EQUITIES, https://axiomequities.com/who-we-are/ (last visited May 15, 2025).
[8] *See id.*, https://axiomequities.com/about/(last visited May 15, 2025).

than $48,000 per unit. As emphasized, the plumbing system in particular was likely to require substantial investment, if not a total overhaul.

78.     Axiom either substantially disclosed this fact—i.e., that Aspen Place's infrastructure was in an abject state—to KDR before the sale or it did not. Again, the complex presented major plumbing problems well before 2022, of which Axiom plainly had reason to know.

79.     Given this, with reasonable underlying assumptions about rational actors in markets, Axiom likely either (1) substantially disclosed such facts and received a significantly discounted price from KDR as a result; (2) substantially disclosed such facts and received a fair-market price from KDR because KDR had no intention of renovating the infrastructure at Aspen Place yet believed it could still obtain fair-market rents despite the complex's habitability concerns; or (3) did not substantially disclose such facts to KDR before the sale and received a fair-market price for the property.

80.     All that said, there's no doubt, as alluded to above, that the plumbing problem at Aspen Place festered further after the sale. Hence, Mr. Zimmerman's assertion that KDR had decided to finally "completely overhaul" the system several years after purchasing the property—and only when the complex was on the brink of condemnation.

81.     Discovery is required with general regard to the sales transaction between Axiom and KDR, including as to the parties' knowledge and/or disclosures regarding Aspen Place's water systems, any assurances or obligations in that regard, and when precisely Axiom Property Management ceased managing the property entirely.

82.    KDR, at a "KDR Groups" URL, has a website where it represents itself as follows, including as to its (possibly unauthorized) provision of "legal services":[9]

## ABOUT US

🕐 JULY 1, 2015

**There is no substitute for Experience!** Since inception in 2003, KDR Group has acquired and owns over 1700 units in Kansas and Missouri.

The **KDR Group** provides in-house management, maintenance, accounting, marketing, and legal services. We work daily to maintain and improve the rental experience in a cost effective manner. Our integrity in achieving the best value for our residents' money, also adds value to our investment and superior returns to our investors.

The hands-on knowledge gained over the past decade in acquiring, managing and maintaining multifamily units enables us to bring proven processes to the table to quickly respond to changing market conditions.

## SERVICES

### Property Management

The effective management of real estate assets today involves a number of very diverse tasks. KDR GROUP offers its clients the services defined in the categories below:

- Strategic Planning
- Marketing
- Leasing
- Tenant Coordination
- Engineering Management
- Architectural Services
- Financial / Investment Services
- Administrative Services

83.    Additionally, KDR holds itself out as offering property-management services as follows:[10]

84.    Based on Plaintiffs' experiences, KDR effectively offers *no* property management at all, let alone this puffed-up array of services.

---

[9] *See* https://www.kdrgroups.com (last visited May 14, 2025)
[10] *See* https://www.kdrgroups.com/?page_id=16 (last visited May 14, 2025).

85.     KDR also holds itself out as owning a number of other properties in Kansas and Missouri.[11]

86.     Of particular interest here, KMBC 9 News (Kansas City, MO), in 2023, published an online article about KDR's "community" in Lawrence—Autumn & August Place Apartments—in which it reported that the mother of a disabled son found that he had been living there with "plumbing leaks" and "broken air-conditioning and leaks in the windows." Sadly, but unsurprisingly, KDR "finally fixed the [disabled son's] stove after months, **but only after signing a new lease**."[12]

87.     Also unsurprisingly, KDR's Google reviews are generally *abysmal*, with endless detailed, documented stories of, in essence, failing to meet tenants' needs. Conspicuously, though, an occasional glowing, 5-star review will appear and, given Ms. Fellows' experience with KDR's retaliation, it's evident that some or all of these positive reviews were likely paid and/or coerced. To wit, per a review by a (now former) Aspen Place resident:



**Austin Lockwood**
Local Guide · 19 reviews · 2 photos

⭐☆☆☆☆  5 days ago   NEW

Not sure who these people are giving these positive reviews considering rampant water line breaks, horrible road conditions and sewage buildup are NOT new problems here.

The city has finally condemned this place in a move that was long overdue.

Edit: The lawyers representing these owners also had the gaul to suggest that since repairs of the waterline were already being prepared, there was no need for the city to take action and that residents would have been fine living in homes without running water for weeks on end and with roads collapsing beneath their cars. Despicable!

---

[11] *See* https://www.kdrgroups.com/?page_id=25 (last visited May 14, 2025).

[12] *See* KMBC 9 NEWS, KANSAS CITY at https://www.kmbc.com/article/woman-details-concerns-about-sons-apartment-unit-and-complex-in-lawrence-kansas/45487913 (last visited May 15, 2025)(emphasis added).

88.     Thereby, KDR has demonstrated a robust pattern and practice of misconduct, ranging from gross negligence to outright venality, both within and without Aspen Place. Discovery is required as to KDR's coercion, or otherwise manipulation, of falsely positive online reviews.

## CLASS-ACTION ALLEGATIONS

89.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring this action on behalf of themselves and the following proposed **habitability-issue class** ("Class"):

*All persons who resided at Aspen Place on or after the date five years prior to the filing date of this Complaint through the date the Class is certified.*

90.     "Class Period" shall thereby be defined as the period five years prior to the filing date of this Complaint through the date the Class is certified.

91.     Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned; that judge(s)' spouse; and members of the judge or judges' staff(s).

92.     **Numerosity**. As stated, 700 residents were recently compelled to evacuate Aspen Place, which contains 188 apartment units. The complex has also realized some significant level of resident turnover. Thus, the proposed Class certainly comprises well over a thousand members, and quite possibly several thousand members, given the Class Period.

93.     **Commonality and Predominance**.  Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual members. These common questions include:

         i.     Whether Aspen Place had systemic water-system deficiencies during the Class

Period;

ii.    Whether Aspen Place's water-delivery/pipes/plumbing should have been substantially replaced before further leasing during the Class Period;

iii.   Whether Defendants reasonably disclosed their knowledge of any systemic water-system deficiencies at Aspen Place to prospective tenants during the Class Period;

iv.    Whether Class members were subjected to significant water-related deficiencies while living at Aspen Place during the Class Period, including but not limited to the mass constructive and/or wrongful eviction on or about May 8, 2025;

v.     Whether Defendants were negligent with regard to their ownership and/or management of Aspen Place during the Class Period; *and*

vi.    Whether Plaintiffs and Class members are entitled to monetary damages, restitution, punitive damages, or other remedies.

Further, with the exception of the claims as applied to Plaintiffs' individual apartment units, Plaintiffs' class-action claims are literally common in that they pertain to common areas and/or the complex as a whole. Obviously, water was (or should have been) delivered to, and distributed throughout, the complex via main lines, which were themselves deficient; it is not as if individual apartment buildings came with unit-specific reservoirs or wells.

94.    **Typicality**. Plaintiffs' claims are typical of the claims of members of the proposed Class. Plaintiffs and the members of the proposed Class all lived at Aspen Place during the Class Period and were subjected to its common water-delivery system, as well as the mass constructive and/or wrongful eviction on or about May 8, 2025.

95.    **Adequacy**. Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class-action litigation, and they will prosecute this action vigorously on the Class members' behalf.

96.        **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same issues, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

97.        In the alternative, the proposed Class may be certified because:

   i.      The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

   ii.     The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or which would substantially impair their ability to protect their interests; *and*

   iii.    Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final relief with respect to the members of the proposed Class as a whole.

## CAUSES OF ACTION

### COUNT I:
### VIOLATIONS OF THE WARRANTY OF HABITABILITY
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

98.        Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

99. Plaintiffs bring this Count I individually and on behalf of the Class members.

100.      Plaintiffs bring this Count I individually as to their apartment units.

101.      Plaintiffs and the members of the Class entered into lease agreements with KDR and/or Axiom and/or Axiom Property Management, all of which, as described, owned and/or managed Aspen Place during the Class Period.

102.      One of the express and/or implied terms of those contracts was that Defendants would provide living quarters that were, and would remain, habitable. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

103.      Defendants, by permitting water shortages and related issues, such as persistent leaking, pipe bursts, and unduly low water pressure, have violated (many times over) K.S.A. §§ 8-432, 17-61-63, 19-225, and 19-238.

104.      In so doing, Defendants have breached the lease agreements. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

105.      Plaintiffs and the Class members are therefore entitled to recover their actual damages, which is the difference between the fair market rental value of the units as they "should have been" and the fair market rental value of the units as they "actually [were]." *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

106.      Plaintiffs and the Class members are also entitled to recover consequential damages. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345-46 (Kan. Ct. App. 1989).

107.      Defendants' breach of the warranty of habitability, as described, went on for years before Aspen Place was finally condemned.

108.      Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' violations of the warranty of habitability.

109.     Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

110.     Therefore, Plaintiffs, individually and on behalf of the Class members, ask the Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages, punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

111.     As outlined above, Plaintiffs propose that this Count I be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT II:**
**BREACH OF CONTRACT AND STATUTORY DUTY TO MATERIALLY COMPLY**
**WITH LEASE AND TO PROVIDE HABITABLE HOUSING**
**(K.S.A. § 58-2559(b))**
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

112.     Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

113.     Plaintiffs bring this Count II individually and on behalf of the Class members.

114.     Plaintiffs bring this Count II individually as to their apartment units.

115.     K.S.A. § 58-2559(b) allows tenants to recover damages for a landlord's noncompliance with a rental agreement or K.S.A. § 58-2553.

116.     K.S.A. § 58-2553(a)(1) requires landlords to comply with applicable building and housing codes materially affecting health and safety.

117.     Defendants, by permitting water shortages and related issues, such as persistent leaking, pipe bursts, and unduly low water pressure, areas, have violated (many times over) K.S.A. §§ 8-432, 17-61-63, 19-225, and 19-238.

118.     The germane rental agreements, whether express or implied, required Defendants to reasonably provide water, a most essential service and habitability concern. By failing to do so, Defendants materially failed to comply with the rental agreements.

119.     Defendants were repeatedly put on notice of, and thereby had actual knowledge of, Aspen Place's systemic water-delivery and related deficiencies.

120.     Pursuant to K.S.A. § 58-2559(b), Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

121.     A contract existed between Plaintiffs (and all other tenants) and Defendants that obligated Plaintiffs and the Class members to pay rent in exchange for housing that conformed to the terms contained in their leases.

122.     Plaintiffs and the Class members paid such rent but Defendants failed to provide housing that conformed to the contractual terms. To the extent any of the members of the Class failed to timely make any rent payments, that failure was justified via the doctrine of constructive eviction.

123.     Such agreements obligated Defendants to reliably provide Aspen Place residents with sufficient, clean running water. Defendants failed to satisfy this obligation.

124.     These breaches damaged Plaintiffs and the Class members by subjecting them to the afore-described water shortages, leaking, pipe bursts, unduly low water pressure, and possibly even contaminated water, as suggested by the boil advisory.

125.     Defendants' breaches in this regard were extant for years and, as stated, the City of

Gardner's condemnation explicitly recognized the "**significant safety concerns**" at Aspen Place,

which had likewise existed for years.

126.     Plaintiffs and the Class members have suffered, and will continue to suffer, actual

damages from Defendants' breaches of the rental agreements and codes/statutes, including, but

not limited to, emotional distress.

127.     Defendants' conduct, as alleged herein, was intentional, willful, wanton,

fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

128.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter

judgment in their favor and against Defendants for their actual damages, punitive damages, pre

and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court

may find just and proper under the circumstances described herein.

129.     As outlined above, Plaintiffs propose that this Count II be certified for class

treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution

of the class issues, they and the Class members proceed to individual trials on causation and

damages, including punitive damages.

### COUNT III:
### FAILURE TO PROVIDE ESSENTIAL SERVICES
### (K.S.A. § 58-2563)
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

130.     Plaintiffs incorporate by reference all the foregoing paragraphs as though fully

reiterated herein.

131.     Plaintiffs bring this Count III individually and on behalf of the Class members.

132.     Plaintiffs bring this Count III individually as to their apartment units.

133.     Pursuant to K.S.A. § 58-2563, tenants may recover up to one-and-a-half times the periodic rent for any period during which the landlord/manager deprived them of essential services.

134.     By failing to reasonably provide water-related services and remediation of problems in that respect, Defendants deprived Plaintiffs and the Class members of such essential services.

135.     The reliable provision of water is obviously an essential service and a life/health/safety issue under the CODE.

136.     Timely remediating flooding/leaking/dampness, mold and mildew, and sewage issues are also essential services.

137.     Defendants acted willfully because, as described, they long knew that Aspen Place's infrastructure was aged, unstable, decaying, and unreliable yet, rather than overhaul it, they let it continue to deteriorate, with Axiom tactically passing the problem on to KDR, yet with Plaintiffs and the Class members actually bearing the brunt of the complex's systemic deficiencies.

138.     As a result of Defendants' conduct in this regard, Plaintiffs and the Class members have been damaged.

139.     Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

140.     Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes, including, but not limited to, emotional distress.

141.     Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

142.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages (1.5 x periodic rent), punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

143.     As outlined above, Plaintiffs propose that this Count III be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT IV:**
**NEGLIGENCE**
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

144.     Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

145.     Plaintiffs bring this Count IV individually and on behalf of the Class members.

146.     Plaintiffs bring this Count IV on behalf of the Class as to Aspen Place's common water system(s).

147.     Plaintiffs bring this Count IV individually as to their apartment units.

148.     Defendants, as owners and/or managers of Aspen Place, owed Plaintiffs and all tenants a duty to exercise reasonable care in providing habitable housing.

149.     Here, such duty included the reasonable provision of clean, running water, as well as the timely remediation of water-related problems and the maintenance of reliable water-delivery infrastructure at the complex.

150.     Defendants, as emphasized, knew that Aspen Place's water-delivery infrastructure was seriously deficient, unstable, decaying, and possibly prone to contamination.

151.     Nonetheless, Defendants did not disclose such conditions to Plaintiffs and the other Class members. Some or all of these conditions were not open and obvious. Defendants had a duty to inspect, warn, and promptly remediate with regard to these conditions.

152.     Defendants breached their duty of reasonable care with respect to, as described, providing water, providing water-related maintenance and inspection services, and in failing to disclose the complex's poor and/or dangerous conditions to tenants.

153.     These breaches were the direct and proximate causes of injuries to Plaintiffs.

154.     Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

155.     Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes, including, but not limited to, emotional distress.

156.     Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

157.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

158.     As outlined above, Plaintiffs propose that this Count IV be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## COUNT V:
## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT

*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

159.    Plaintiffs incorporate by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

160.    The Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 *et seq.*, prohibits the use of deceptive and unconscionable acts and practices in connection with consumer transactions in Kansas.

161.    Plaintiffs and the putative Class members are each a "consumer" as defined by K.S.A. § 50-624(b). Specifically, Plaintiffs and the proposed Class members each sought and acquired property and/or service—the renting of their respective units—from Defendants.  Their residential nature also illustrates that these purchases were definitionally for personal, family, household, business, and/or agricultural purposes.

162.    Defendants are each a "supplier" as defined by K.S.A. § 50-624(l). Specifically, each Defendant is a person who, in the ordinary course of business, solicits, engages in, and/or enforces consumer transactions.

163.    Plaintiffs and the Class members each entered into, with Defendants, a "consumer transaction" via the lease of property and/or services in Kansas.

164.    The KCPA is to be liberally construed to promote its policies of protecting consumers from suppliers that commit deceptive and unconscionable acts and practices. K.S.A. § 50-623; *Williamson v. Amrani*, 283 Kan. 227, 237 (2007).

165.    Defendants' violations of the KCPA include, but are not limited to, the following:

   a.   Willfully concealing, suppressing, and/or omitting the material fact of Aspen Place's deficient water-delivery system(s), in violation of K.S.A. § 50-626(b)(3);

   b.   Falsely representing, explicitly or implicitly, that the apartments at Aspen Place

would/could reliably receive running water, in violation of K.S.A. § 50-626(b)(1)(A), (b)(1)(D), and (b)(1)(G);

c.  Taking advantage of the tenants' inability to protect their interests, given the generally hidden condition of the water infrastructure and shortage of affordable housing, in violation of K.S.A. § 50-627(b)(1); and

d.  Committing unconscionable conduct by charging and collecting rent from the tenants when the premises were uninhabitable, in violation of K.S.A. § 50-627(a).

166.    Plaintiffs, individually and on behalf of the Class members, are entitled to recover their actual damages, pursuant to K.S.A. § 50-634(b). Plaintiffs' and the Class members' actual damages include, but are not limited to, the rent they have paid and emotional distress. Further investigation and discovery is required to ascertain whether personal injuries may have been sustained as well.

167.    Because Plaintiffs and the Class members will be seeking their damages only on an individual basis, they are alternatively entitled to recover civil penalties for <u>each</u> violation of the KCPA, pursuant to K.S.A. § 50-636, if such civil penalties exceed their actual damages. Should Plaintiffs and the Class members prevail on both this KCPA claim and a common-law claim, they are entitled to recover both their actual damages and civil penalties. *See Louisburg Bldg. & Dev. Co., LLC v. Albright*, 45 Kan. App. 2d 618, 665 (Kan. App. 2011).

168.    Plaintiffs, individually and on behalf of the Class, are also entitled to recover their reasonable costs and attorneys' fees pursuant to K.S.A. § 50-634(e).

169.    The KCPA provides for up to $10,000 in civil penalties for each violation, pursuant to K.S.A. § 50-636(a).

170.    As outlined above, Plaintiffs propose that this Count V be certified for class treatment as to all issues other than causation, damages, and civil penalties. Plaintiffs propose that,

after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## JURY TRIAL DEMANDED

171.     Plaintiffs demand a jury trial for all issues so triable.

## DESIGNATION OF PLACE FOR JURY TRIAL

172.     Plaintiffs designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,


*/s/ Bryce B. Bell*
Bryce B. Bell          KS#20866
Jenilee V. Zentrich    KS#29098
**BELL LAW, LLC**
2600 Grand Blvd., Ste. 580
Kansas City, Missouri 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com
JZ@BellLawKC.com

*Attorneys for Plaintiffs and the Proposed Class*