## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

**ARIC COOPERWOOD**, **ANTHONY FELLOWS**, and **RACHEL FELLOWS**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**KDR AP, LLC**; **KDR REALTY, LLC**; **AXIOM PROPERTY MANAGEMENT, LLC**; **AXIOM PROPERTY MANAGEMENT II, LLC**; **AXIOM EQUITIES, LLC**; and **AXIOM-ASPEN, LLC**

Defendants.

**Case No.: 2:25-CV-2267-EFM-GEB**

**CLASS-ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS-ACTION COMPLAINT

Plaintiffs Aric Cooperwood, Anthony Fellows, and Rachel Fellows, by and through the undersigned counsel, hereby submit this First Amended Complaint ("FAC") for monetary damages on behalf of themselves and all others similarly situated, allege the following against Defendants:

### INTRODUCTION

1.      Pursuant to prior agreement and Court order (Doc. 30 and 32), Plaintiffs and the proposed class hereby submit their First Amended Complaint.

2.      This case is primarily about the long-running neglect of multiple ownership and property-management entities to substantially invest in, and thereby repair, the decaying, unstable plumbing system at a residential apartment complex. The property at issue is the Aspen Place Apartments ("Aspen Place"), located at 101 Aspen Rd. in Gardner, KS, which was recently—

1

finally—condemned by the City of Gardner owing to its persistent inability to supply its residents

with water. That condemnation resulted in a short-notice, intensely stressful mass displacement of

Aspen Place residents, all of whom were suddenly compelled to find new places to stay after

having already suffered the effects of negligent property management. A copy of the Notice of

Unsafe/Unfit Structures giving a deadline of May 8, 2025 to vacate is found below:



3.    As alluded to above, the water lines at Aspen Place had presented significant long-

term maintenance problems affecting the delivery of essential services to tenants (such as water)

well before the condemnation. The municipality finally issued that judgment after a series of minor

citations inappropriate to the magnitude of the deficiency. Of course, safe, clean water is essential

to life and running water is among the most fundamental of habitability concerns; an apartment in

which one cannot shower or bathe, wash dishes, boil water, obtain drinking water, or do laundry

is effectively worthless in a reasonably competitive market. Naturally, the systemic water-related

problems at Aspen Place, which were both realized and latent, were not disclosed to eventual

residents before they entered their leases. Indeed, few, if any, would have entered leases had they

been suitably apprised that the pipes running through the complex were liable to burst over

Christmas; sewage was prone to back up in their market-rate apartment; or they may well find themselves completely deprived of water and the entire complex condemned. However, those who benefited from their rents—ownership and property-management businesses—knew, or certainly should have known, for years that the plumbing infrastructure running throughout Aspen Place was in a dismal state, unsustainable, in need of investment, and thereby an avoidable disaster due to the long-running neglect of the property's water and plumbing systems.

4. This is a proposed class action and mass tort. Specifically, Plaintiffs propose that this case be managed as follows:

    a. Any injunctive relief claims will be addressed via one or more classes, for which certification will be sought under Rule 23(b)(2);

    b. All damages will be addressed via one or more issue classes, with the determination of causation and damages to be handled by way of individual trials. Plaintiffs anticipate certification of these issues under Rule 23(b)(3) and (c)(4).

5. Because damages will be addressed on an individual basis, Plaintiffs anticipate that multiple other current and former tenants at Aspen Place will join this case, either by being joined as named plaintiffs, as class members post-certification, and/or by seeking to intervene. Plaintiffs hereby give notice to Defendants of this potential and that such future plaintiffs will argue that any such claims relate back to this Complaint by virtue of this notice, and the original Complaint filed May 16, 2025 (Doc. 1).

6. Further, should one or more of these classes not be certified, Plaintiffs hereby give notice to the Court and Defendants that they may seek to convert this case, in whole or in part, to a mass tort. Claims of other past, current, and future residents of the Center who may be joined

and/or seek to intervene should be deemed to relate back to the original Complaint filed May 16, 2025.

7.    Each of the plaintiffs and putative class members suffered separate and distinct acts of damages throughout the **Class Period**, defined below.

### PARTIES

8.    Defendant KDR AP, LLC is a Kansas limited liability company and was served on May 21, 2025. KDR AP, LLC was formed in 2022 to effect the purchase and ownership of Aspen Place.

9.    Defendant KDR Realty, LLC was served on May 21, 2025.

10.    These two KDR Defendants will be collectively referred to herein, for the sake of convenience, as "KDR" or the "KDR Defendants". It seems these and/or other KDR entities also do business as "KDR Group."

11.    KDR is the current owner and manager of Aspen Place, having purchased the property in 2022. Clearly, the two aforementioned entities are closely intertwined; they apparently comprise a family-run business. On information and belief, KDR's President, Puneet Gorawara, is married to its Vice President, Aabha Gorawara. Additionally, the Gorawaras apparently use their daughter—on information and belief, Gauri—to perform property-management services. Defendant Axiom Property Management, LLC was served on May 22, 2025.

12.    Defendant Axiom Property Management, LLC was served on May 22, 2025.

13.    Defendant Axiom Property Management II, LLC was served on May 22, 2025.

14.    The two Axiom Property Management entities will herein be referred to, for the sake of convenience, as "Axiom Property Management."

15.     Per its Facebook page, Axiom Property Management stated in 2023 that it was based out of Kansas City and described itself as "an owner/operator" of over 20 properties in the area. Axiom Property Management was responsible for managing Aspen Place (at least) until the property was sold to KDR.

16.     Defendant Axiom Equities, LLC was served on May 22, 2025.

17.     Defendant Axiom-Aspen, LLC was served on May 22, 2025.

18.     These two non-"Property Management" Axiom entities will be collectively referred to herein, for the sake of convenience, as merely "Axiom." Obviously, the Axiom entities named herein, both as to property management and ownership/investment, are closely related, with substantially overlapping membership and control. Discovery is required to determine the various entities' precise relationships vis-à-vis Aspen Place.

19.     Axiom owned Aspen Place until it was sold to KDR in May of 2022.

20.     Plaintiffs' counsel, via a letter dated May 9, 2025, expressly put KDR, Axiom, and Axiom Property Management on notice with respect to legal representation; intent to file this class action; the duty to preserve documents, information, tangible things, and ESI; and a cease-and-desist regarding the possible coercion of residents regarding their legal rights.

21.     Based on representations made under oath by principals, officers, and/or directors, Axiom Family of Companies, LLC and Axiom Equities Investments, LLC are hereby dismissed without prejudice and thus not included as defendants in the First Amended Complaint.

22.     Plaintiff Aric Cooperwood is a natural person, consumer, and citizen of Kansas.

23.     Plaintiff Anthony Fellows is a natural person, consumer, and citizen of Kansas.

24.     Plaintiff Rachel Fellows is a natural person, consumer, and citizen of Kansas.

25. Other unnamed putative class members resided in states other than Kansas at the time of filing of the original Complaint on May 16, 2025.

## JURISDICTION & VENUE

26. The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act, as (1) it is a proposed class action (likely comprising thousands of class members); (2) members of the plaintiff class are citizens of a state different from that of some Defendants; and (3) the amount in controversy exceeds $5 million.[1]

27. This Court has personal jurisdiction over all Defendants because, at the least, each registered to do business in Kansas and, in fact, routinely did/does business in Kansas, including with specific regard to the matters described herein. This Court has general personal jurisdiction over multiple Defendants because they are citizens of Kansas.

28. Venue in this Court is proper because most, if not all, of the events giving rise to this dispute occurred in Kansas.

29. This Court previously addressed jurisdictional issues under CAFA and, after reviewing submissions by Plaintiffs' counsel, concluded "Plaintiffs have carried their burden, at least as it applies at the pleading stage, to establish minimal diversity as to 28 U.S.C. § 1332(d)(2)" (Doc 28).

## FACTS COMMON TO ALL CLAIMS

30. The buildings comprising Aspen Place were constructed in 1954; the complex consists of 188 units.

---

[1] Due to the conditions at Aspen Place, Plaintiffs seek back rent for the class period (5 years). At a conservative $1,000.00 per month for each of the 188 units, this amounts to over $11,000,000 just in rent damages sought. Plaintiffs also seek damages for property, loss of use, emotional distress, civil penalties, attorneys' fees and expenses, and punitive damages.

31.     Despite offering 188 units, Aspen Place was not designed as a high-rise or complex of a few sizeable, multistory buildings. Rather, it entails a large number of duplex-like apartments; the reason for this atypical layout is that the buildings formerly housed soldiers stationed at a military base.

32.     Aspen Place offered one, two, three, and four-bedroom units until quite recently, when the residents were constructively and/or wrongfully evicted and/or displaced owing the aforementioned total, or near-total, lack of water.

33.     Because water service was unavailable, severely restricted, and/or unreliable due to infrastructure failures, the fair market rental value of the affected units was zero. An apartment without running water has no rental value in a competitive market, as it cannot be lawfully occupied or used for residential purposes.

34.     The infrastructure at Aspen Place was failing (characterized by low pressure, frequent outages, leaks, and bursts), the fair market rental value was effectively zero given the lack of consistently delivered clean and healthy water.

35.     Per an article posted on May 7, 2025, Fox 4 News in Kansas City reported that the City of Gardner had finally condemned Aspen Place owing to "**significant safety concerns**" affecting 700 residents.[2]

36.     From May 6th to May 8th of 2025, those 700 residents had 48 hour's notice to vacate their homes due to the negligence of the Defendants.

37.     That article also attributed quotes from a written statement to Jeff Zimmerman, who, as an attorney for the "KDR Group," stated: "Keeping up with the aging water system became

---

[2] *See* FOX 4 NEWS, KANSAS CITY at https://fox4kc.com/news/700-residents-impacted-by-aspen-place-condemnation-in-gardner-kansas/(last visited May 15, 2025)(emphasis added).

too much, so they decided to completely overhaul the system. The timing of the City's condemnation was unfortunate when the City's firetruck collapsed the water line. This has become a monumental problem and we are working to figure out solutions and will work with the City and Community Groups who are also working on this."

38.     Completely overhauling the water system would have not only required that KDR commit to major affirmative expenditure but also forgo significant rental income.

39.     Discovery is required into KDR's capitalization and insurance, including as to whether it could have afforded to "completely overhaul" Aspen Place's water system and any plans it had developed in that respect.

40.     Plaintiff Aric Cooperwood entered a new lease with KDR on November 11, 2024 after having moved into the complex in December 2022. That lease was for the premises located at 178 Aspen St., Gardner, KS 66030. The term of that lease was January 9, 2025 through January 8, 2026.

41.     The lease stated that Mr. Cooperwood paid a $930.00 security deposit.

42.     The monthly charge under Mr. Cooperwood's lease was $1,063.00, including $10.50 for "liability to landlord insurance," and $4.50 for an "administrative fee" for that "liability to landlord insurance":[3]

## 11.2 CHARGES

Resident(s) hereby agree to pay a mandatory monthly Landlord Liability Insurance Premium("LLIP") fees of ($10.50) per month, subject to no proration. This is an amount equal to the actual premium charge to the Lessor including any premium taxes and fees due to state governing bodies. Additionally, an Administration Fee in the amount of four dollars and fifty cents ($4.50) to be retained by the Lessor for processing and handling will be charged.

---

[3] Taken from p.21 of Mr. Cooperwood's lease with KDR.

43.     While, as in this example, the lease's syntax and grammar is often vague and ambiguous, as well as objectively incorrect, it seems that KDR here unconscionably passed the cost of its own general-liability policy(ies) onto its tenants.

44.     Unsurprisingly, Mr. Cooperwood's lease contained any number of other unfair, if not unconscionable, as well as unclear, terms and charges. That is, while failing to reasonably provide an essential service, or services, KDR shamelessly nickel-and-dimed the Aspen Place tenants.

45.     Reading between the lines, the terms of Mr. Cooperwood's lease rendered it that much more evident that KDR *knew* the complex's water systems were a mess and passed the cost and responsibility therefor onto the tenants—e.g.:[4]

---

### 2.1 UTILITIES

The Tenant shall pay all utility charges when due and, in the event Tenant shall fail to pay said utility charges for any reason, Landlord may, at his option, pay such charges and collect the same from Tenant as additional rent, along with the late charge above stated. The heat must be left at the lowest heat seating if tenant moves out during winter months, the heat is NEVER to be turned off as frozen pipes will result. Tenant will be financially responsible for any water damages in case of frozen pipe.

---

46.     Putting aside the fact that "the lowest heat [setting]" is entirely vague, as is "any water damages in case of frozen pipe[s]," it is evident that KDR—which began charging tenants for utilities, including water, via a lease addendum beginning in late 2023—was well aware of the systemic fragility and inadequacy of Aspen Place's plumbing and sought to make the residents culpable, through the most expansive and nebulous language, for its deficiencies.

---

[4] Taken from p.3 of Mr. Cooperwood's lease with KDR (highlights added).

47.     Likewise, KDR declared in the lease that, in addition to the usual sorts of *force majeure* considerations, it would not be responsible for "water overflow/leakage," mold, or "utility interruption[s]." These terms, in context, were unconscionable, if not overtly unlawful.

48.     And, despite these disclaimers and the fact that KDR charged tenants for the aforementioned "liability to landlord insurance," it further required lessees, via a Renter's Insurance Addendum, to purchase a "personal liability policy with, at a minimum, $100,000 limit" and add KDR as an insured while *also* making it that much more obvious that KDR was passing the cost of Aspen Place's plumbing issues on to the tenants:[5]

**Aspen Place Office**



101 Aspen St • Gardner, KS 66030
(913) 856-8185

## 11. Renter's Insurance Addendum

### 11.1  REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum replaces  Lease Apartment Section 3(h) in the Lease Agreement, which, in summary, requires Tenant to purchase a personal liability policy with, at minimum, a $100,000 limit. It will be updated as follows :

This Addendum is attached to and becomes a part of the Lease Agreement as attached dated  11/11/2024 . For the duration of the Lease Agreement, Tenant(s) are required to maintain the following minimum required insurance coverage:

- $100,000 Limit of Liability for Tenant's legal liability for damage to Landlord's property for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage ("Required Insurance").

49.     So, per its leases with Plaintiffs and the proposed class members, KDR charged tenants every month for its own liability insurance *and* required them to purchase outsized liability policies with KDR as an insured, while making it evident that water-related problems were a primary concern, *and* while requiring tenants to pay the actual utility bills (via system dubbed "RUBS") while also failing to reliably supply water. KDR even began requiring tenants to pay a "water-usage fee," which was itself based on the number of residents living in the complex, not a

---

[5] Taken from p.21 of Mr. Cooperwood's lease with KDR (highlights added).

given tenant's actual "usage" of water. This, then, entailed another misrepresented and unconscionable pass-through of *some* cost to tenants by KDR.

50.    Robust discovery into KDR's insurance policies and practices is needed and justified, including with regard to its "Tenant Liability Insurance Program" and coverage arrangement with Great American E&S Insurance Co:[6]

## OPTION 2:

**Do nothing — you will automatically be enrolled in our Tenant Liability Insurance Program.**

This is an easy and low cost way to meet your lease requirement, but does not cover your personal belongings. You pay the monthly premium together with rent.
(Details below).

51.    Given the aforementioned lease terms, as well as KDR's absurdly inadequate property management, it appears to be in substantial part a kind of insurance arbitrage scheme.

52.    As to Plaintiff Cooperwood's experience as a resident at Aspen Place, he witnessed his rent increase while KDR also extracted the cost of utilities, including trash removal, from that cost, via, as stated, lease addendums. Additionally, these addendums were ostensibly added, at

---

[6] Taken from p.54 of Mr. Cooperwood's lease with KDR.

least in a number of cases, *during* lease terms, so as to constitute unconscionable contracts of adhesion.

53.    Mr. Cooperwood routinely encountered—roughly every few months—water-related problems during his tenancy at Aspen Place. These included, but were not limited to, unduly low water pressures, water-heater malfunctions, and a boil advisory from an apparent employee of Johnson County.

54.    On May 6, 2025, the City of Gardner posted a condemnation notice on the door of Mr. Cooperwood's unit, by which it declared it "**unfit for human occupancy**."

55.    Plaintiffs Anthony and Rachel Fellows, a married couple, lived at Aspen Place for approximately five years before finding themselves forced to vacate the premises because of the condemnation; they moved in during July 2020, when the complex was owned and managed by, respectively, Axiom and Axiom Property Management. The Fellowses also have two young children.

56.    The Fellowses experienced long-running water and pipe-related issues, including as to sewage and mold. For example, in 2023, they experienced persistent water outages for at least two weeks around Christmas. Then, in 2024, they experienced a week-long water outage around Easter.

57.    KDR was exceedingly slow to respond to burst pipes, while also leaving visible leaks unrepaired for months, which caused property damage. As described, KDR tactically used unconscionable insurance-related conditions and practices as a shield relative to its own property-management and ownership deficiencies.

58.     After KDR began utilizing the aforementioned, unconscionable "RUBS" system in late 2023, the Fellowses noted, unsurprisingly, that the water bills submitted by KDR were outsized, in the amount of approximately $80-100 per month for their family of four.

59.     Discovery is required into KDR's utility-related billing practices, including but not limited to inflation, manipulation, and/or misrepresentation of consumer water bills, both individually and relative to the complex as a whole, as there is good reason to believe that KDR not only failed to provide an essential service but also profited from that failure in excess of inflated rents—i.e., via illusory insurance and utility-billing practices.

60.     KDR demanded, unconscionably, that the Fellowses sign a new utility addendum following the water outage over Christmas 2023.

61.     Further, KDR engaged in deceitful, in addition to neglectful, property-management practices as it would mark maintenance requests "complete" despite having done nothing in that respect or, alternatively, simply leave such requests dangling in "contractor status" indefinitely.

62.     Yet further, the Fellowses encountered substantial mold and mildew issues, ostensibly as a result of pipe bursts and sustained leaking, as well as sewage backup. KDR simply never fixed a/the sewage drain that was malfunctioning just outside their unit.

63.     Remarkably, despite the Fellowses timely rent payments in the face of KDR's functionally nonexistent property management, it retaliated against them when, in January 2024, it rejected their lease-renewal application *because the Fellowses had left negative reviews about it online and Rachel Fellows had appeared in the news with respect to KDR's mismanagement*. **In order to have the application accepted, KDR compelled Ms. Fellows *to delete the negative reviews in its presence*.** Later, the Gorawara daughter also mocked Ms. Fellows about her appearance on the news. A/the property manager also quit shortly after that incident.

13

64.     While pipe-related problems clearly entailed the most severe and sustained habitability issues for the Fellowses, they also encountered problems with electrical wiring, which KDR neglected to fix.

65.     All the Plaintiffs have endured substantial emotional distress because of the issues complained of herein, including, but not limited to the City of Gardner's condemnation of the property that began on May 6, 2025 and lasted until at least May 8, 2025.

66.     Plaintiffs and the putative class members suffered bodily injury resulting from the severe emotional distress suffered as a result of the Defendants' negligence, breach of contract, constructive eviction, breach of the warranty of habitability and/or other statutory violations at Aspen Place.

67.     All the Plaintiffs, as well as the putative class members, as defined below, have suffered financial injuries in the form of, non-exhaustively, inflated rent, insurance, utility payments, and/or loss of use of personal property.

68.     Plaintiffs and the putative class members each suffered separate and distinct occurrences of property damage, interference with property rights, interference with the right to clean and running water, emotional distress, bodily injury, and/or the other types of damages alleged in paragraphs 65 to 67.

69.     After discovery, Defendants conduct may be considered intentional, willful, and/or wanton based on the length, duration, and degree of neglect.

### Axiom, KDR, and the Sale of Aspen Place

70.     Axiom maintains a website that introduces its aforementioned members/principals/owners: John Emanuels, Ben Kalny, Randy Treas, and Richard Stone.[7]

---

[7] *See* AXIOM EQUITIES, https://axiomequities.com/who-we-are/ (last visited May 15, 2025).

71.     With regard to management and capitalization, Axiom holds itself out as being well-financed and well-managed, including with "committed on-site teams [that] manage each property daily to ensure the success of each property."[8]

72.     Axiom sold Aspen Place to KDR in 2022.

73.     On information and belief, Axiom sold Aspen Place to KDR because it realized that the property would continue to require outsized maintenance expenditures, thereby eating into profitability. The sale price was, on information and belief, approximately $9 million—i.e., less than $48,000 per unit. As emphasized, the plumbing system in particular was likely to require substantial investment, if not a total overhaul.

74.     Axiom either substantially disclosed this fact—i.e., that Aspen Place's infrastructure was in an abject state—to KDR before the sale or it did not. Again, the complex presented major plumbing problems well before 2022, of which Axiom plainly had reason to know.

75.     Given this, with reasonable underlying assumptions about rational actors in markets, Axiom likely either (1) substantially disclosed such facts and received a significantly discounted price from KDR as a result; (2) substantially disclosed such facts and received a fair-market price from KDR because KDR had no intention of renovating the infrastructure at Aspen Place yet believed it could still obtain fair-market rents despite the complex's habitability concerns; or (3) did not substantially disclose such facts to KDR before the sale and received a fair-market price for the property.

76.     All that said, there's no doubt, as alluded to above, that the plumbing problem at Aspen Place festered further after the sale. Hence, Mr. Zimmerman's assertion that KDR had

---

[8] *See id.*, https://axiomequities.com/about/(last visited May 15, 2025).

decided to finally "completely overhaul" the system several years after purchasing the property—and only when the complex was on the brink of condemnation.

77.     Discovery is required with general regard to the sales transaction between Axiom and KDR, including as to the parties' knowledge and/or disclosures regarding Aspen Place's water systems, any assurances or obligations in that regard, and when precisely Axiom Property Management ceased managing the property entirely.

78.     KDR, at a "KDR Groups" URL, has a website where it represents itself as providing, among other things "legal services".[9]

79.     Additionally, KDR holds itself out as offering property-management services as follows:[10]

## SERVICES

### Property Management

The effective management of real estate assets today involves a number of very diverse tasks. KDR GROUP offers its clients the services defined in the categories below:

- Strategic Planning
- Marketing
- Leasing
- Tenant Coordination
- Engineering Management
- Architectural Services
- Financial / Investment Services
- Administrative Services

80. Based on Plaintiffs' experiences, KDR effectively offers *no* property management at all, let alone this puffed-up array of services.

---

[9] *See* https://www.kdrgroups.com (last visited May 14, 2025)
[10] *See* https://www.kdrgroups.com/?page_id=16 (last visited May 14, 2025).

81.     KDR also holds itself out as owning a number of other properties in Kansas and Missouri.[11]

82.     Of particular interest here, KMBC 9 News (Kansas City, MO), in 2023, published an online article about KDR's "community" in Lawrence—Autumn & August Place Apartments—in which it reported that the mother of a disabled son found that he had been living there with "plumbing leaks" and "broken air-conditioning and leaks in the windows." Sadly, but unsurprisingly, KDR "finally fixed the [disabled son's] stove after months, **but only after signing a new lease.**"[12]

83.     Also unsurprisingly, KDR's Google reviews are generally *abysmal*, with endless detailed, documented stories of, in essence, failing to meet tenants' needs. Conspicuously, though, an occasional glowing, 5-star review will appear and, given Ms. Fellows' experience with KDR's retaliation, it's evident that some or all of these positive reviews were likely paid and/or coerced. To wit, per a review by a (now former) Aspen Place resident:



**Austin Lockwood**
Local Guide · 19 reviews · 2 photos

★☆☆☆☆  5 days ago   **NEW**

Not sure who these people are giving these positive reviews considering rampant water line breaks, horrible road conditions and sewage buildup are NOT new problems here.

The city has finally condemned this place in a move that was long overdue.

Edit: The lawyers representing these owners also had the gaul to suggest that since repairs of the waterline were already being prepared, there was no need for the city to take action and that residents would have been fine living in homes without running water for weeks on end and with roads collapsing beneath their cars. Despicable!

---

[11] *See* https://www.kdrgroups.com/?page_id=25 (last visited May 14, 2025).

[12] *See* KMBC 9 News, Kansas City at https://www.kmbc.com/article/woman-details-concerns-about-sons-apartment-unit-and-complex-in-lawrence-kansas/45487913 (last visited May 15, 2025)(emphasis added).

## **Neglect of Infrastructure and Water Systems under**
## **KDR's Ownership and Maintenance**

84.     On **October 2, 2024**, Grandbridge Real Estate Capital LLC ("Primary Servicer"), the servicer for KDR's loan on the Aspen Place property, issued a notice of non-compliance to KDR. This letter put KDR on formal notice that they had failed to comply with terms of their Loan Documents requiring repairs to the Aspen Place property, specifically regarding maintenance of the following items:

a.  Seal coat asphalt surfaces throughout.
b.  Stripe parking stalls.
c.  Sectional asphalt replacement.
d.  Sectional curb replacement.
e.  Prescriptively air seal gaps, cracks, penetration and transition in the building envelope of 188 apartments.
f.  Install communication, smart thermostats in 100% of apartments to control heating and cooling. Energy Star certified thermostats must be selected if a compatible unit is available.
g.  Install low flow, 1.0 gallon per minute aerators in 75% of apartment bathroom faucet fixtures, currently rated higher than 1.0 GPM.
h.  Install low flow, 1.5 gallon per minute aerators in 67% of apartment kitchen faucet fixtures, currently rated higher than 1.5 GPM.
i.  Install low flow, 1.25 GPM EPA water senses-certified showerheads in 100% of apartments.
j.  Install thermostatic showerhead valves in 100% of apartment bathrooms.

85.     The Primary Servicer granted KDR four separate extensions to complete these required repairs. Thus, the neglect regarding these repairs, and others, began well before the October 2, 2024 letter from the Primary Servicer.

86.     Despite these extensions and repeated warnings, KDR continued to delay the necessary maintenance, ultimately prompting Morgan Chase Commercial Mortgage Securities Corp, Multifamily Mortgage Pass-Through Certificates, Series 2022-KG07 ("Lender") to file suit for Foreclosure against KDR in Johnson County District Court case number JO-2025-CV-001164.

The Petition for Suit on Note, Foreclosure, Appointment of Receiver, and Accounting explicitly alleges that the May 6, 2025, condemnation of Aspen Place resulted directly from KDR's failure to perform the required repairs outlined in the October 2024 notice of non-compliance.

87.     **On January 22, 2025**, KDR received a bid from S&S Excavation & OP Concrete for $1.25 Million to remove and replace the main water lines serving the Aspen Place property. This bid came months after KDR had already failed to meet the repair deadlines outlined in their loan documents. Despite having this concrete proposal in hand, KDR failed to take meaningful action, specifically:

    a.   Tenants received no notice or information regarding any upcoming major construction relating to the property's water systems; and

    b.   KDR did not submit the proposed plans to the City of Gardner until approximately May 16, 2025 – which was over 100 days after received the bid and ten days after the property had already been condemned.

88.     This delay exemplifies KDR's established pattern of postponing necessary repairs until forced to act by external pressure, rather than proactively maintaining the property or protecting their tenants' welfare. KDR's history demonstrates they neglected to take meaningful steps to repair the property's infrastructure (water systems, etc.) for tenants until their financial investment was at imminent risk of foreclosure.

89.     In **May of 2025**, the foreclosure action was eventually filed against KDR. In its responsive pleadings, KDR alleged that they had been in contact with engineering firm (Cook, Flatt, and Stobel "CFS") since April 2025, to design and implement a new water line system for Aspen Place. While this motion and KDR's response to the Emergency Motion for Appointment of Receiver allege that they are not in monetary default of the Aspen Place property, they offer no

such defenses that they are in default of the loan contract requiring maintenance and upkeep of the property.

90.     Furthermore, plans to fix the water systems that left Aspen Place condemned do nothing to remedy the harm faced by Plaintiffs and the Class members who were displaced from their homes, forced to find emergency housing, and subjected to years of substandard living conditions. KDR's belated remediation efforts do not excuse their pattern of negligence, nor do such plans negate their failure to provide habitable housing throughout the Class Period. The harm to tenants was inflicted long before KDR took action, and prospective repairs provide no relief for past injuries suffered.

91.     These three events – The October 2024 notice of non-compliance, the January 2025 bid that sat unacted upon for months, and the May 2025 emergency motion filed only after condemnation demonstrate a consistent pattern; KDR took action only when threatened with financial consequences, never proactively to protect tenant welfare.

92.     Thereby, KDR has demonstrated a robust pattern and practice of neglect, ranging from negligence to reckless indifference to the rights of others, both within and without Aspen Place. Discovery is required as to KDR's coercion, or otherwise manipulation, of falsely positive online reviews.

## COVID-19 TOLLING OF STATUTE OF LIMITATIONS

93.     Pursuant to multiple orders issued by the Chief Judge Luckert of the Supreme Court of the State of Kansas, Plaintiffs hereby plead that time calculation for any and all statute of limitation or other time standards governing the state-law claims in this Complaint should be tolled.

94.     Chief Justice Luckert's orders included administrative order 2021-PR-020 which suspended deadlines and time limitations suspended under this order and prior administrative orders to resume April 15, 2021.

95.     Incorporating by reference all prior orders, therefore, the time calculation for Plaintiffs' state-law claims were tolled from March 19, 2020, through April 14, 2021.

## CLASS-ACTION ALLEGATIONS

96.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring this action on behalf of themselves and the following proposed class members ("**Class**"):

*All persons who resided at Aspen Place on or after the date five years prior to the filing date of the Complaint (Doc. 1) through the date the Class is certified.*

97.     "**Class Period**" shall thereby be defined as the period five years prior to the filing date of the original Complaint (Doc. 1) on May 16, 2025, through the date the Class is certified.

98.     Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned; that judge(s)' spouse; and members of the judge or judges' staff(s).

99.     **Numerosity**. As stated, 700 residents were recently compelled to evacuate Aspen Place, which contains 188 apartment units. The complex has also realized some significant level of resident turnover. Thus, the proposed Class certainly comprises well over a thousand members, and quite possibly several thousand members, given the Class Period.

100.    **Commonality and Predominance**. Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual members. These common questions include:

21

      i.     Whether Aspen Place had systemic water-system deficiencies during the Class Period;

      ii.    Whether Aspen Place suffered from any complex-wide infrastructure issues;

      iii.   Whether Aspen Place's water-delivery/pipes/plumbing should have been substantially replaced before further leasing during the Class Period;

      iv.   Whether Defendants reasonably disclosed their knowledge of any systemic water-system deficiencies at Aspen Place to prospective tenants during the Class Period;

      v.    Whether Class members were subjected to utility disruption (water services, etc.) while living at Aspen Place during the Class Period;

      vi.   Whether Defendants were negligent with regard to their ownership and/or management of Aspen Place during the Class Period; *and*

      vii.   Whether Plaintiffs and Class members are entitled to monetary damages, restitution, punitive damages, or other remedies.

Further, with the exception of the claims as applied to Plaintiffs' individual apartment units, Plaintiffs' class-action claims are common in that they pertain to common areas and/or the complex as a whole; as such, these are building-wide issues that affect all residents. Obviously, water was (or should have been) delivered to, and distributed throughout, the complex via main lines, which were themselves deficient; it is not as if individual apartment buildings came with unit-specific reservoirs or wells. Thus, the water systems affected the putative class members a complex-wide issue.

101.   **Typicality**. Plaintiffs' claims are typical of the claims of members of the proposed Class. Plaintiffs and the members of the proposed Class all lived at Aspen Place during the Class Period and were subjected to its common water-delivery systems and other infrastructure issues, as well as the emergency displacement of over 700 residents starting on May 6, 2025 and running until at least May 8, 2025. The named Plaintiffs also signed form leases the same, or substantially similar, to all other class members.

102.    **Adequacy**. Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class-action litigation, and they will prosecute this action vigorously on the Class members' behalf.

103.    **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same issues, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

104.    In the alternative, the proposed Class may be certified because:

i.    The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

ii.    The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or which would substantially impair their ability to protect their interests; *and*

iii.    Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final relief with respect to the members of the proposed Class as a whole.

**CAUSES OF ACTION**

**COUNT I:**
**VIOLATIONS OF THE WARRANTY OF HABITABILITY**

*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

105.    Plaintiffs bring this Count I individually and on behalf of the Class members.

106.    Plaintiffs bring this Count I individually as to their apartment units.

107.    Plaintiffs and the members of the Class entered into lease agreements with KDR and/or Axiom and/or Axiom Property Management, all of which, as described, owned and/or managed Aspen Place during the Class Period.

108.    One of the express and/or implied terms of those contracts was that Defendants would provide living quarters that were, and would remain, habitable. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

109.    Defendants, by permitting water shortages and related issues, such as persistent leaking, pipe bursts, and unduly low water pressure, have violated Kansas law many times over.

110.    In so doing, Defendants have breached the lease agreements. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

111.    Plaintiffs and the Class members are therefore entitled to recover their actual damages, which is the difference between the fair market rental value of the units as they "should have been" and the fair market rental value of the units as they "actually [were]." *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989).

112.    Because the water service was often completely unavailable or the units were otherwise uninhabitable due to water infrastructure failures, the fair market rental value of the units was zero. Apartments without running water, or without reliable water service, have no rental value in a competitive market and cannot lawfully be occupied for residential purposes. During such periods, Plaintiffs and Class members are entitled to recover 100% of the rent paid to Defendants.

113.    Plaintiffs and the Class members are also entitled to recover consequential damages. *See Love v. Monarch Apartments*, <u>13 Kan. App. 2d 341, 345-46</u> (Kan. Ct. App. 1989).

114.    Defendants' breach of the warranty of habitability, as described, went on for years before Aspen Place was finally condemned.

115.    Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' violations of the warranty of habitability.

116.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

117.    Therefore, Plaintiffs, individually and on behalf of the Class members, ask the Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages, punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

118.    As outlined above, Plaintiffs propose that this Count I be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT II:**
**BREACH OF CONTRACT AND STATUTORY DUTY TO MATERIALLY COMPLY**
**WITH LEASE AND TO PROVIDE HABITABLE HOUSING**
<u>**(K.S.A. § 58-2559(b))**</u>
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

119.    Plaintiffs bring this Count II individually and on behalf of the Class members.

120.    Plaintiffs bring this Count II individually as to their apartment units.

121.    K.S.A. § 58-2559(b) allows tenants to recover damages for a landlord's noncompliance with a rental agreement or K.S.A. § 58-2553.

122.    K.S.A. § 58-2553(a)(1) requires landlords to comply with applicable building and housing codes materially affecting health and safety.

123.    Defendants, by permitting water shortages and related issues, such as persistent leaking, pipe bursts, and unduly low water pressure, areas, have violated Kansas law many times over.

124.    The germane rental agreements, whether express or implied, required Defendants to reasonably provide water, a most essential service and habitability concern. By failing to do so, Defendants materially failed to comply with the rental agreements.

125.    Defendants were repeatedly put on notice of, and thereby had actual knowledge of, Aspen Place's systemic water-delivery and related deficiencies.

126.    Pursuant to K.S.A. § 58-2559(b), Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

127.    A contract existed between Plaintiffs (and all other tenants) and Defendants that obligated Plaintiffs and the Class members to pay rent in exchange for housing that conformed to the terms contained in their leases.

128.    Plaintiffs and the Class members paid such rent but Defendants failed to provide housing that conformed to the contractual terms. To the extent any of the members of the Class failed to timely make any rent payments, that failure was justified via the doctrine of constructive eviction.

129.    Such agreements obligated Defendants to reliably provide Aspen Place residents with sufficient, clean running water. Defendants failed to satisfy this obligation.

130.    These breaches damaged Plaintiffs and the Class members by subjecting them to the afore-described water shortages, leaking, pipe bursts, unduly low water pressure, and possibly even contaminated water, as suggested by the boil advisory.

131.    Defendants' breaches in this regard were extant for years and, as stated, the City of Gardner's condemnation explicitly recognized the "**significant safety concerns**" at Aspen Place, which had likewise existed for years.

132.    Plaintiffs and Class members paid rent for premises that, due to Defendants' breaches, had substantially diminished or zero fair market rental value. Because of the complete water service failure and/or severe infrastructure malfunction rendering the premises uninhabitable, the fair market value was zero, and Plaintiffs and Class members are entitled to recover 100% of rent paid.

133.    Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes, including, but not limited to, emotional distress.

134.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

135.    Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

136.    As outlined above, Plaintiffs propose that this Count II be certified for class treatment as to all issues other than causation and damages. Plaintiffs propose that, after resolution

of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT III:**
**FAILURE TO PROVIDE ESSENTIAL SERVICES**
**(K.S.A. § 58-2563)**
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

137.     Plaintiffs bring this Count III individually and on behalf of the Class members.

138.     Plaintiffs bring this Count III individually as to their apartment units.

139.     Pursuant to K.S.A. § 58-2563, tenants may recover up to one-and-a-half times the periodic rent for any period during which the landlord/manager deprived them of essential services.

140.     By failing to reasonably provide water-related services and remediation of problems in that respect, Defendants deprived Plaintiffs and the Class members of such essential services.

141.     The reliable provision of water is obviously an essential service and a life/health/safety issue under the CODE.

142.     Timely remediating flooding/leaking/dampness, mold and mildew, and sewage issues are also essential services.

143.     Defendants acted willfully because, as described, they long knew that Aspen Place's infrastructure was aged, unstable, decaying, and unreliable yet, rather than overhaul it, they let it continue to deteriorate, with Axiom tactically passing the problem on to KDR, yet with Plaintiffs and the Class members actually bearing the brunt of the complex's systemic deficiencies.

144.     As a result of Defendants' conduct in this regard, Plaintiffs and the Class members have been damaged.

28

145.     Because Defendants deprived Plaintiffs and Class members of essential water services, the fair market rental value of the affected units was zero. Premises without essential services cannot be lawfully occupied for residential purposes and have no rental value. Plaintiffs and Class members are therefore entitled to recover not only 1.5 times the periodic rent under K.S.A. § 58-2563, but also recognition that the actual value received during such periods was zero, supporting awards of the full statutory penalty.

146.     Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

147.     Plaintiffs and the Class members have suffered, and will continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes, including, but not limited to, emotional distress.

148.     Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

149.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages (1.5 x periodic rent), punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

150.     As outlined above, Plaintiffs propose that this Count III be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## COUNT IV:
## CONSTRUCTIVE EVICTION
*Plaintiffs individually and on behalf of the Class*
*against all KDR Defendants*

151. Plaintiffs bring this Count IV individually and on behalf of the Class members.

152. Plaintiffs bring this Count IV individually as to their apartment units.

153. The KDR Defendants, as owners and/or managers of Aspen Place, owed Plaintiffs and all tenants a duty to exercise reasonable care in providing adequate utilities, including water.

154. Here, such duty included the reasonable provision of clean, running water, as well as the timely remediation of water-related problems and the maintenance of reliable water-delivery infrastructure at the complex.

155. The KDR Defendants, as emphasized, knew that Aspen Place's water-delivery infrastructure was seriously deficient, unstable, decaying, and possibly prone to contamination.

156. Nonetheless, Defendants did not disclose such conditions to Plaintiffs and the other Class members. Some or all of these conditions were not open and obvious. Defendants had a duty to inspect, warn, and promptly remediate with regard to these conditions.

157. Defendants breached its contractual, common law, and/or statutory duties by failing to, as described, providing water, providing water-related maintenance and inspection services, and in failing to disclose the complex's poor and/or dangerous conditions to tenants.

158. These breaches were the direct and proximate causes of injuries to Plaintiffs.

159. The KDR Defendants' actions and/or failure to act substantially interfered with and/or deprived, the tenants of the beneficial use of and enjoyment of the leased premises.

160. To the extent that the KDR Defendants weren't aware of the systemic water system issues after or shortly after the purchase of Aspen Place in May of 2022, Plaintiffs and the proposed class members provided notice in the form of constructive, written, and/or verbal notice to the KDR Defendants of the systemic water deficiencies at the complex.

161. The KDR Defendants failed to remedy the deficiencies in the water systems.

162.    Kansas law recognizes that tenants may recover damages for constructive eviction even while continuing to occupy the premises if conditions are so severe as to constitute a substantial deprivation of use.

163.    Plaintiffs and the Class members seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

164.    The measure of Plaintiffs' and Class members' actual damages includes the difference between the rent they paid and the fair market rental value of premises with deficient water infrastructure. Because water service was unavailable or severely compromised due to Defendants' negligence, the fair market rental value was zero, as apartments without functional water infrastructure cannot be lawfully occupied and have no value in a competitive rental market.

165.    Plaintiffs and the Class members have suffered, and may continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes, including, but not limited to, emotional distress.

166.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless, thereby entitling Plaintiffs and the Class members to punitive damages.

167.    Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

168.    As outlined above, Plaintiffs propose that this Count IV be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## COUNT V:
## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

169.    The Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 *et seq.*, prohibits the use of deceptive and unconscionable acts and practices in connection with consumer transactions in Kansas.

170.    Plaintiffs and the putative Class members are each a "consumer" as defined by K.S.A. § 50-624(b). Specifically, Plaintiffs and the proposed Class members each sought and acquired property and/or service—the renting of their respective units—from Defendants.  Their residential nature also illustrates that these purchases were definitionally for personal, family, household, business, and/or agricultural purposes.

171.    Defendants are each a "supplier" as defined by K.S.A. § 50-624(l). Specifically, each Defendant is a person who, in the ordinary course of business, solicits, engages in, and/or enforces consumer transactions.

172.    Plaintiffs and the Class members each entered into, with Defendants, a "consumer transaction" via the lease of property and/or services in Kansas.

173.    The KCPA is to be liberally construed to promote its policies of protecting consumers from suppliers that commit deceptive and unconscionable acts and practices. K.S.A. § 50-623; *Williamson v. Amrani*, 283 Kan. 227, 237 (2007).

174.    Defendants' violations of the KCPA include, but are not limited to, the following:

a.  Willfully concealing, suppressing, and/or omitting the material fact of Aspen Place's deficient water-delivery system(s), in violation of K.S.A. § 50-626(b)(3);

b.  Falsely representing, explicitly or implicitly, that the apartments at Aspen Place would/could reliably receive running water, in violation of K.S.A. § 50-626(b)(1)(A), (b)(1)(D), and (b)(1)(G);

c.  Representing that the apartments had characteristics, uses, and benefits that they did not have—specifically, functional water infrastructure and reliable water service—in violation of K.S.A. § 50-626(b)(1)(B);

d.  Representing that the apartments were of a particular standard, quality, or grade—market-rate, habitable housing—when they were in fact substandard and ultimately condemned as uninhabitable, in violation of K.S.A. § 50-626(b)(5);

e.  Representing through the lease agreements that certain transactions conferred rights, remedies, or obligations which they did not have or involve, including unconscionable insurance requirements, mid-lease utility addendums, and lease disclaimers that contradicted Defendants' statutory duties, in violation of K.S.A. § 50-626(b)(7);

f.  Causing confusion or misunderstanding regarding utility billing through the RUBS system and "water usage fees" that did not reflect actual individual usage but were based on complex-wide occupancy, in violation of K.S.A. § 50-626(b)(1)(A) and (b)(12);

g.  Taking advantage of the tenants' inability to protect their interests, given the generally hidden condition of the water infrastructure and shortage of affordable housing, in violation of K.S.A. § 50-627(b)(1); and

h.  Taking advantage of tenants' inability to reasonably protect their interests due to lack of expertise regarding plumbing infrastructure, inability to inspect hidden water systems, and economic necessity for affordable housing, in violation of K.S.A. § 50-627(b)(2);

i.  Committing unconscionable conduct by charging and collecting rent from the tenants when the premises were uninhabitable, in violation of K.S.A. § 50-627(a).

j.  Committing unconscionable conduct by requiring tenants to pay for Defendants' own "liability to landlord insurance" while simultaneously requiring tenants to purchase separate renters' insurance policies with KDR as an additional insured, in violation of K.S.A. § 50-627(a);

k.  Committing unconscionable conduct by implementing the RUBS utility billing system and "water usage fees" mid-lease term through adhesive addendums, thereby increasing tenants' costs while failing to provide the water service being billed for, in violation of K.S.A. § 50-627(a);

l.  Engaging in coercion and undue influence by retaliating against Rachel Fellows for posting negative online reviews and appearing in news coverage, including

33

refusing to process her lease renewal application until she deleted negative reviews in KDR's presence, in violation of K.S.A. § 50-627(b)(3);

m. Engaging in coercion by conditioning lease renewals on deletion of honest consumer reviews, in violation of K.S.A. § 50-627(b)(3);

n. Manipulating or coercing falsely positive online reviews to deceive prospective tenants about the true conditions at Aspen Place, in violation of K.S.A. § 50-626(b)(1)(A) and (b)(12);

o. Engaging in deceptive practices through the use of vague, ambiguous, and unconscionable lease terms that attempted to shift Defendants' legal responsibilities onto tenants, including disclaimers regarding "water overflow/leakage," "utility interruptions," and frozen pipes, in violation of K.S.A. § 50-626(b)(12) and 50-627(a); and

p. Representing through lease provisions that tenants waived or disclaimed rights, remedies, or obligations guaranteed by the Kansas Residential Landlord and Tenant Act, in violation of K.S.A. § 50-626(b)(7) and (b)(8), including but not limited to:

  i. Lease provisions purporting to disclaim landlord liability for "water overflow/leakage," "utility interruptions," and "mold," thereby attempting to waive Defendants' statutory duties under K.S.A. § 58-2553 to maintain plumbing and sanitary systems in good working order;

  ii. Lease provisions requiring tenants to maintain heat settings and accept liability for frozen pipes, thereby attempting to shift statutory landlord maintenance duties under K.S.A. § 58-2553(a)(3) onto tenants;

  iii. Lease provisions requiring tenants to pay for "liability to landlord insurance" and purchase separate renters insurance naming KDR as additional insured, thereby attempting to shift Defendants' own liability obligations onto consumers in violation of public policy;

  iv. Mid-lease utility addendums imposed as contracts of adhesion, purporting to modify tenants' rights and obligations without proper consideration and in derogation of their lease terms; and

  v. Any other lease provisions that contradict, waive, or purport to limit rights guaranteed to tenants under the RLTA, which are void and unenforceable as against public policy under K.S.A. § 58-2516.

175. The violations described in subsection (p) above constitute per se KCPA violations under K.S.A. § 50-626(b)(8), which applies "whether or not any consumer has in fact been misled."

The inclusion of lease provisions that misrepresent tenants' statutory rights is itself an unlawful deceptive act regardless of whether tenants understood, relied upon, or were actually deceived by such provisions. K.S.A. § 58-2516 expressly provides that any lease provision attempting to waive or limit tenant rights under the RLTA is "unenforceable," making the inclusion of such provisions in standardized lease forms both an RLTA violation and an independent KCPA violation.

176. These violations were not isolated incidents but constituted a systematic pattern and practice of deceptive and unconscionable conduct throughout the Class Period, affecting hundreds of consumers.

177. Defendants' KCPA violations were willful, as evidenced by their continued collection of rent despite knowledge of systemic infrastructure failures, their retaliation against tenants who complained publicly, their implementation of unconscionable billing practices and lease terms designed to insulate themselves from liability while profiting from uninhabitable conditions, and their use of standardized lease forms containing provisions that violate the RLTA and misrepresent tenants' statutory rights.

178. Defendants cannot escape liability for including illegal lease provisions by arguing that tenants were sophisticated enough to recognize these provisions as unenforceable. K.S.A. § 50-626(b)(8) makes the inclusion of such provisions itself an unlawful deceptive act "whether or not any consumer has in fact been misled." The statute protects all consumers, regardless of their level of sophistication, from suppliers who misrepresent the rights, remedies, and obligations involved in consumer transactions.

179. Plaintiffs, individually and on behalf of the Class members, are entitled to recover their actual damages, pursuant to K.S.A. § 50-634(b). Plaintiffs' and the Class members' actual damages include, but are not limited to, all rent paid during the Class Period. Because water service

was unavailable or so unreliable as to render the premises uninhabitable, the fair market rental value of the units was zero, meaning Plaintiffs and Class members received no value for the rent payments they made to Defendants. Actual damages also include emotional distress, property damage, costs of displacement, utility payments made for services that could not be reliably delivered, and unconscionable insurance charges. Further investigation and discovery is required to ascertain whether bodily injuries may have been sustained as well.

180.    Because Plaintiffs and the Class members will be seeking their damages only on an individual basis, they are alternatively entitled to recover civil penalties for each violation of the KCPA, pursuant to K.S.A. § 50-636, if such civil penalties exceed their actual damages. Given the multiple violations alleged herein—including but not limited to concealment of material facts, false representations, unconscionable insurance schemes, unconscionable billing practices, retaliation against consumers exercising their rights, and inclusion of illegal lease provisions that misrepresent tenants' statutory rights—each affected lease transaction involves numerous separate KCPA violations potentially supporting multiple civil penalty awards of up to $10,000 per violation. With 188 units and significant tenant turnover during the five-year Class Period, the potential civil penalties far exceed $10 million even before considering actual damages. Should Plaintiffs and the Class members prevail on both this KCPA claim and a common-law claim, they are entitled to recover both their actual damages and civil penalties. *See Louisburg Bldg. & Dev. Co., LLC v. Albright*, 45 Kan. App. 2d 618, 665 (Kan. App. 2011).

181.    Plaintiffs, individually and on behalf of the Class, are also entitled to recover their reasonable costs and attorneys' fees pursuant to K.S.A. § 50-634(e).

182.    The KCPA provides for up to $10,000 in civil penalties for each violation, pursuant to K.S.A. § 50-636(a).

183.    As outlined above, Plaintiffs propose that this Count V be certified for class treatment as to all issues other than causation, damages, and civil penalties. Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## COUNT VI:
## NEGLIGENCE – FAILURE TO MAINTAIN WATER SYSTEMS
*Plaintiffs individually and on behalf of the Class*
*against all Defendants*

184.    Plaintiffs bring this Count VI individually and on behalf of the Class members.

185.    Plaintiffs bring this Count VI individually as to their apartment units.

186.    Plaintiffs bring this Count VI on behalf of the class as to Aspen Place's common water delivery infrastructure and systems used by tenants for drinking water, bathing, cooking, and other typical tenant uses.

187.    Plaintiffs bring this Count VI individually as to the water delivery systems servicing their respective apartment units.

188.    As owners and/or managers of Aspen Place, Defendants owed a duty of reasonable care to Plaintiffs and all tenants to maintain the property's water delivery infrastructure in a safe and functional condition.

189.    This duty included but was not limited to: regularly inspecting water lines, pipes, and related infrastructure; promptly repairing known defects in the water delivery systems; replacing aging or deteriorated components before they failed; and preventing foreseeable water-related failures that could cause property damage or personal injury.

190.    Defendants knew, or reasonably should have known, that Aspen Place's water delivery infrastructure was severely aged, having been installed when the buildings were constructed in 1954.

37

191.    Defendants knew, or reasonably should have known, that the water lines, pipes, and related infrastructure throughout Aspen Place were deteriorating, prone to failure, and in need of substantial repair or replacement.

192.    Despite this actual or constructive knowledge, Defendants failed to exercise reasonable care in maintaining, repairing, or replacing the water delivery systems.

193.    Defendants' failures in this regard include, but are not limited to:

    a.    Failing to conduct adequate inspections of the water delivery infrastructure;

    b.    Failing to repair or replace aging, deteriorating, or defective water lines and pipes in a timely manner;

    c.    Allowing persistent leaks to continue unabated for extended periods;

    d.    Failing to prevent recurring pipe bursts despite knowing of the infrastructure's fragility;

    e.    Failing to maintain adequate water pressure throughout the complex;

    f.    Allowing the water delivery systems to deteriorate to the point where the entire complex was condemned for lack of water service; and

    g.    Prioritizing short-term profits over necessary capital improvements to the water infrastructure.

194.    Defendants' failures to maintain the water delivery systems directly and proximately caused injuries to Plaintiffs and the Class members.

195.    As a direct and proximate result of Defendants' negligent failure to maintain the water delivery systems, Plaintiffs and the Class members suffered damages including, but not limited to:

    a.    Property damage from water leaks, pipe bursts, and flooding;

     b.   Damage to personal property and belongings;

     c.   Loss of use of personal property;

     d.   Costs associated with the emergency displacement on or about May 8, 2025;

     e.   Inconvenience and disruption to daily life from recurring water outages and problems;

     f.   Emotional distress; and

     g.   Other consequential damages to be proven at trial.

     h.   The measure of actual damages includes the difference between rent paid and the fair market rental value of premises with non-functional or severely deficient water delivery systems. Because of the water service failures and infrastructure deficiency, the fair market rental value was zero, and Plaintiffs and Class members are entitled to recover 100% of rent paid.

196.    Defendants' conduct was not merely negligent but demonstrated reckless indifference to the rights and safety of others. Defendants continued to collect rent from tenants while consciously disregarding the deteriorating condition of essential infrastructure systems, ultimately resulting in the condemnation of the entire complex.

197.    Defendants' pattern of neglect, as documented by the October 2, 2024 notice of non-compliance from their lender, the January 22, 2025 bid for water system replacement that they failed to act upon for months, and their eventual failure to prevent the May 6, 2025 condemnation, demonstrates conduct warranting punitive damages.

198.    Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages,

punitive damages, pre-and post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

199.    As outlined above, Plaintiffs propose that this Count VI be certified for class treatment as to all issues other than causation and damages. Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT VII:**
**NEGLIGENCE –**
**FAILURE TO MAINTAIN EMERGENCY VEHICLE ACCESS**
**AND ROADWAY INFRASTRUCTURE**
*Plaintiffs individually and on behalf of the Class against all KDR Defendants only*

200.    Plaintiffs bring this Count VII individually and on behalf of the Class members.

201.    Plaintiffs bring this Count VII on behalf of the Class as to Aspen Place's common roadways, parking areas, emergency access routes, and related infrastructure.

202.    As owners and/or managers of Aspen Place, the KDR Defendants owed a duty of reasonable care to Plaintiffs and all tenants to maintain the property's roadways, parking areas, driveways, emergency access routes, and related infrastructure in a safe and functional condition.

203.    This duty included, but was not limited to: regularly inspecting roadways and paved surfaces for deterioration; promptly repairing known defects in roads, parking areas, and curbs; replacing deteriorated asphalt and concrete before structural failure; maintaining adequate load-bearing capacity for emergency vehicles; ensuring continuous, unobstructed emergency vehicle access at all times; designating and maintaining alternative emergency access routes during repairs or construction; properly coordinating with emergency services regarding any impediments to access; and preventing foreseeable failures that could impede emergency response or cause property damage.

204.    On or about May 6, 2025, during an emergency response to Aspen Place, fire trucks responding to the emergency were forced to drive through an area that had been blocked off by KDR for repairs to water lines, resulting in a water line break that contributed to the total loss of water service and subsequent condemnation of the property.

205.    KDR admits in pleadings filed in Johnson County District Court case JO-2025-CV-001164 that "the issue which caused the underlying water line break in the first instance was emergency access fire trucks driving through a portion of the area which was then blocked off for repairs to the existing water line."

206.    This admission demonstrates that Defendants blocked off a portion of Aspen Place for water line repairs without ensuring adequate alternative emergency vehicle access, forcing emergency responders to drive through the blocked-off repair area and causing catastrophic damage to the water infrastructure.

207.    The KDR Defendants knew, or reasonably should have known, that blocking access routes at a residential complex housing approximately 700 residents without providing adequate alternative emergency access created an unreasonable risk of harm.

208.    The October 2, 2024, notice of non-compliance from Defendants' lender specifically identified multiple deficiencies in the property's roadway infrastructure that contributed to this failure, including:

    a.   Failure to seal coat asphalt surfaces throughout the property;

    b.   Failure to stripe parking stalls;

    c.   Need for sectional asphalt replacement; and

    d.   Need for sectional curb replacement.

209.   These identified deficiencies demonstrate that Defendants knew the roadway infrastructure at Aspen Place was severely deteriorated and unable to safely accommodate the weight and stress of emergency vehicles, particularly in areas where underlying water line work was being performed.

210.   Despite receiving four extensions from their lender to complete these required repairs, Defendants failed to adequately maintain, repair, or replace the deteriorating roadway infrastructure before undertaking water line repairs that would further compromise emergency access.

211.   Defendants' failures in this regard include, but are not limited to:

a.   Failing to conduct adequate inspections of roadways, parking areas, and related infrastructure before blocking off areas for repairs;

b.   Failing to designate, mark, and maintain adequate alternative emergency vehicle access routes during water line repair work;

c.   Failing to coordinate with local fire and emergency services regarding blocked access areas and alternative routes;

d.   Failing to ensure that roadway infrastructure could support emergency vehicle loads in areas where emergency access might be required;

e.   Blocking off repair areas without ensuring emergency responders could safely access the property through alternative routes;

f.   Failing to adequately barricade or structurally support blocked-off areas to withstand emergency vehicle traffic if such access became necessary;

g.   Failing to seal coat or otherwise maintain asphalt surfaces, allowing accelerated deterioration that compromised load-bearing capacity;

h. Failing to replace deteriorated sections of asphalt and concrete in a timely manner before undertaking additional repair work;

i. Allowing the roadway infrastructure to deteriorate to the point where it could not support the weight of emergency vehicles even in non-blocked areas;

j. Failing to maintain adequate structural integrity beneath roadway surfaces to protect underground utilities including water lines during emergency vehicle access; and

k. Prioritizing short-term cost savings over necessary capital improvements to roadway infrastructure and proper coordination of repair work.

212.    Defendants' negligent failure to maintain emergency vehicle access and adequately plan for water line repairs directly and proximately caused the water line break that led to the condemnation of Aspen Place.

213.    Even accepting Defendants' claim that they had engaged engineering firm Cook, Flatt, and Stobel in April 2025 to design a new water line system, this does not excuse their failure to ensure continuous emergency access during the repair process. To the contrary, it demonstrates that Defendants knew repairs would be ongoing and failed to take reasonable precautions to maintain emergency access during such repairs.

214.    As a direct and proximate result of Defendants' negligent failure to maintain emergency vehicle access and roadway infrastructure, Plaintiffs and the Class members suffered damages including, but not limited to:

a. Total loss of water services from May 6 to May 8, 2025, resulting from the May 6, 2025 water line break;

b. Costs associated with emergency relocation, including moving expenses, temporary housing, and storage;

c. Property damage and loss of use of personal property;

d. Loss of rental payments for the property they could no longer occupy;

e. Increased safety risks from impeded emergency vehicle access prior to the catastrophic failure;

f. Emotional distress from the sudden, emergency displacement and loss of their homes; and

g. Other consequential damages to be proven at trial.

h. The fair market rental value of premises without functional water infrastructure, or with water infrastructure so deficient that water service cannot be reliably delivered, is zero. Apartments that cannot provide running water have no rental value and cannot lawfully be occupied. Defendants breached their repair obligations resulting in loss of water service or compromised water delivery, and Plaintiffs and Class members paid rent for premises with zero fair market value and are entitled to recover 100% of such rent payments.

215.   The KDR Defendants' conduct was not merely negligent but demonstrated reckless indifference to the rights and safety of others. Despite receiving formal notice of non-compliance regarding roadway infrastructure deficiencies in October 2024, and despite being granted four extensions to complete repairs, Defendants proceeded with water line repairs that blocked emergency access without ensuring adequate alternative routes or properly maintained roadway infrastructure to support emergency vehicles.

216.     Defendants' decision to block off areas for water line repairs while knowing that: (a) the roadway infrastructure was severely deteriorated; (b) emergency vehicles would need to access the property; and (c) no adequate alternative emergency access had been provided, constitutes conduct warranting punitive damages.

217.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages, punitive damages, pre-and post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

218.     As outlined above, Plaintiffs propose that this Count VII be certified for class treatment as to all issues other than causation and damages. Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT VIII:**
**BREACH OF LEASE AGREEMENT (BREACH OF CONTRACT) –**
**FAILURE TO MAINTAIN WATER INFRASTRUCTURE**
*Plaintiffs individually and on behalf of the Class against all Defendants*

219.     Plaintiffs bring this Count VIII individually and on behalf of the Class members.

220.     Plaintiffs bring this Count VIII individually as to their apartment units and on behalf of the Class as to Aspen Place's common water infrastructure.

221.     Plaintiffs and each Class member entered into written lease agreements with Defendants KDR and/or Axiom and/or Axiom Property Management during the Class Period.

222.     These lease agreements constitute valid, enforceable contracts between the parties.

223.     Pursuant to Section 3.1(d) of the lease agreements drafted by KDR and presented to tenants of Aspen Place for signature (and substantially similar provisions in lease agreements executed by the Axiom Defendants) expressly provides:

**"Tenant will give to the Landlord prompt written notice of any accident to or any defects in the water pipes, electrical light fixtures, heating apparatus, or other part of the building which may come to Tenant's notice in connection with said premises, so that such defects may be corrected, and the Landlord shall have reasonable time thereafter to make repairs."**

224.    This lease provision creates an express contractual obligation on Defendants to repair defects in water pipes and related infrastructure upon receiving notice from tenants.

225.    While Section 23.1 of the lease (Utilities Addendum) assigns payment responsibility for water utility bills to tenants, this provision does not—and cannot—transfer Defendants' contractual obligation to maintain the physical infrastructure (pipes, connections, water lines, and related systems) necessary to deliver water service to the premises.

226.    The lease agreements' promise to deliver possession of the premises necessarily implies delivery of premises capable of receiving essential utilities, including water service through functional infrastructure.

227.    Throughout the Class Period, Plaintiffs and Class members provided Defendants with written and/or verbal notice of numerous defects in water pipes and related infrastructure, including but not limited to:

a.    Persistent water leaks;

b.    Pipe bursts, including the significant pipe bursts over Christmas 2023 and Easter 2024;

c.    Unduly low water pressure;

d.    Complete loss of water service for extended periods;

e.    Water quality issues necessitating boil advisories;

f.    Sewage backup problems related to defective plumbing; and

g.    Mold and mildew resulting from water infrastructure failures.

228.    Despite receiving such notices repeatedly throughout the Class Period, Defendants failed to make necessary repairs to the water pipes and related infrastructure within a reasonable time, or at all.

229.    Defendants' failure to repair was not due to acts of God, failure of public utility services, or other conditions beyond their control. Rather, Defendants consciously chose not to invest in the substantial repairs and replacements necessary to maintain functional water infrastructure.

230.    The October 2, 2024 notice of non-compliance from Defendants' lender documented KDR's failure to perform required maintenance, including installation of water conservation fixtures throughout the property, demonstrating Defendants' systemic neglect of water infrastructure obligations.

231.    The January 22, 2025 bid from S&S Excavation & OP Concrete for $1.25 million to replace main water lines proves that Defendants were aware of the magnitude of necessary repairs but chose not to act until the property was condemned.

232.    Defendants' failure to maintain water infrastructure was systematic and complex-wide, affecting not merely individual units but the entire water delivery system serving all 188 units at Aspen Place.

233.    The May 6, 2025, condemnation of Aspen Place due to inability to provide water service represents the ultimate manifestation of Defendants' breach of their contractual repair obligations under Section 3.1(d) of the lease agreements.

234.    By failing to repair and maintain the water pipes and infrastructure as required by the express terms of the lease agreements, Defendants materially breached their lease agreements with Plaintiffs and all Class members.

235.    The distinction between tenant responsibility for utility payments and landlord responsibility for infrastructure maintenance is clear: tenants agreed to pay for water service delivered through functional infrastructure; they did not agree to pay for water that could not be delivered due to Defendants' failure to maintain that infrastructure.

236.    Defendants cannot claim that assigning utility payment responsibility to tenants relieves them of their express contractual obligation to repair water pipes and maintain plumbing infrastructure in working order.

237.    As a direct and proximate result of Defendants' breach of the lease agreements, Plaintiffs and Class members suffered damages including, but not limited to:

    a.  All rent paid due to defective water infrastructure and Defendants failed to repair as required;

    b.  Utility payments made for water service that could not be properly delivered due to infrastructure failures;

    c.  Property damage resulting from water leaks, pipe bursts, and related infrastructure failures;

    d.  Damage to and loss of use of personal property;

    e.  Costs associated with the constructive eviction on or about May 8, 2025, including moving expenses, storage costs, and temporary housing;

    f.  The difference between the rent paid and the value of the premises actually received without functional water infrastructure;

    g.  Emotional distress; and

    h.  Other consequential damages to be proven at trial.

238.     Despite repeated notices of water infrastructure defects, formal notice from their lender regarding maintenance failures, and obtaining a bid for necessary repairs, Defendants did not to fulfill their contractual repair obligations until forced to do so by condemnation of the property.

239.     This breach of express lease provisions, causing systematic deprivation of water service to hundreds of residents over an extended period, constitutes conduct warranting punitive damages.

240.     Therefore, Plaintiffs, individually and on behalf of the Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages, punitive damages, pre-and post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

241.     As outlined above, Plaintiffs propose that this Count VIII be certified for class treatment as to all issues other than causation and damages. Plaintiffs propose that, after resolution of the class issues, they and the Class members proceed to individual trials on causation and damages, including punitive damages.

## JURY TRIAL DEMANDED

242.     Plaintiffs demand a jury trial for all issues so triable.

## DESIGNATION OF PLACE FOR JURY TRIAL

243.     Plaintiffs designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,

*/s/ Bryce B. Bell*

Bryce B. Bell          KS#20866
**BELL LAW, LLC**
2600 Grand Blvd., Ste. 580
Kansas City, Missouri 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com
*Attorney for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, the above was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Bryce B. Bell*