**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ARIC COOPERWOOD et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>KDR AP, LLC et al,<br><br>*Defendants*. | Case No. 25-2267-EFM-GEB |

**MEMORANDUM AND ORDER**

Before the Court are two motions: Defendants Axiom Property Management, LLC, Axiom Property Management II, LLC, Axiom Equities, LLC, and Axiom-Aspen, LLC ("Axiom Defendants")'s Motion to Dismiss (Doc. 35); and Defendants KDR AP, LLC and KDR Realty, LLC ("KDR Defendants")'s Partial Motion to Dismiss (Doc. 36). Specifically, Axiom Defendants move to dismiss Plaintiffs' First Amended Complaint ("FAC") in its entirety or in part for lack of jurisdictional standing and failure to state a claim. KDR Defendants move to dismiss Counts I, III, IV, and V for failure to state a claim. Plaintiffs oppose the Motions. For the reasons stated below, the Court grants Axiom Defendants' Motion and grants in part and denies in part KDR Defendants' Motion.

## I. Factual and Procedural Background[1]

Plaintiffs Aric Cooperwood, Anthony Fellows, and Rachel Fellows are former residents of Aspen Place Apartments, located at 101 Aspen Rd., Gardner, Kansas ("Aspen Place"). Originally

[1] The facts in this section are taken from Plaintiff's FAC unless otherwise cited.

constructed in 1954, Aspen Place contains multiple buildings comprised of 188 residential units in total. Axiom Defendants owned and managed Aspen Place until May 2022 when ownership and management transferred to KDR Defendants (the "May 2022 transfer"). KDR Defendants currently own and manage Aspen Place. Only Plaintiffs Anthony and Rachel Fellows entered lease agreements with both Axiom Defendants and KDR Defendants; Plaintiff Cooperwood began his tenancy after the May 2022 transfer.

Most of Plaintiffs' claims stem from water-related maintenance problems they experienced during their tenancies at Aspen Place. Plaintiffs describe the plumbing system as "unavailable, severely restricted, and/or unreliable" due to "low pressure, frequent outages, leaks, and [pipe] bursts." Plaintiffs also suffered week-long water outages, mold, and sewage issues. Lease agreements warned tenants to maintain heat during winter to prevent frozen pipes, yet pipe bursts still occurred. These issues were allegedly widespread across the other units, with specific instances cited in 2023, 2024, and 2025. Plaintiffs reported these issues to KDR Defendants, but KDR Defendants' response was "exceedingly slow" and often inadequate. Eventually, the systemic maintenance problems became so severe that the local government intervened. The City of Gardner condemned Aspen Place on May 6, 2025, requiring Plaintiffs and other Aspen Place residents—purportedly 700 in total—to vacate their units by May 8, 2025.

In addition to these maintenance issues, Plaintiffs allege various violations under Kansas law involving lease provisions, insurance requirements, and problematic business practices. Plaintiffs specifically allege that KDR Defendants engaged in manipulation and inflation of water bills, retaliation against Plaintiff Rachel Fellows for her negative online reviews and communications with local news organizations, unconscionable insurance requirements, and other unlawful actions.

On October 10, 2025, Plaintiffs filed this lawsuit on behalf of themselves and a class of individuals who are former residents of Aspen Place. Plaintiffs seek certification of their Rule 23 class action. Defendants filed their respective dismissal motions on November 25, 2025.

## II. Legal Standards

### A. Standard for Rule 12(b)(1)

Under Rule 12(b)(1), a defendant may move to dismiss a claim for lack of subject-matter jurisdiction.[2] Federal courts are courts of limited jurisdiction, and a presumption exists against exercising jurisdiction over a case.[3] The party asserting jurisdiction bears the burden of establishing its existence.[4] Thus, the Court may exercise jurisdiction only when specifically authorized to do so and must dismiss a claim if it becomes apparent at any stage of the proceedings that it lacks jurisdiction.[5]

Rule 12(b)(1) arguments take two forms: (1) a facial attack on the sufficiency of complaint's allegations as to the court's jurisdiction or (2) a factual attack on the facts upon which subject matter is based.[6] This case involves a facial attack, and therefore, the Court must view the factual allegations in the FAC as true.[7]

### B. Standard for Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[8] Upon such motion, the Court

[2] Fed. R. Civ. P. 12(b)(1).

[3] *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1170 (10th Cir. 2023).

[4] *Id.* at 1171.

[5] *Siloam Springs Hotel, LLC v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

[6] *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).

[7] *Id.* (citing *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015)).

[8] Fed. R. Civ. P. 12(b)(6).

must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[9] A claim is facially plausible if the plaintiff pleads facts sufficient for the Court to infer reasonably that the defendant is liable for the alleged misconduct.[10] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well as the grounds on which each claim rests.[11] Under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[12] Viewing the complaint in this manner, the Court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[13] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[14]

## III. Analysis

In the FAC, Plaintiffs allege several Counts against both Axiom Defendants and KDR Defendants based on their lease agreements, the Kansas Residential Landlord-Tenant Act ("RLTA"), and the Kansas Consumer Protection Act ("KCPA"). Due to the nature of the parties' arguments and issues posed under Kansas law, the Court addresses the two sets of Defendants' respective Motions in turn, first addressing Axiom Defendants' Motion and then KDR Defendants' Motion.

---

[9] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[10] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[11] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[12] *Iqbal*, 556 U.S. at 678–79.

[13] *See id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[14] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

## A. Axiom Defendants' Motion to Dismiss

Axiom Defendants raise two arguments for dismissing the FAC. First, Axiom Defendants argue that Plaintiffs lack Article III standing to bring this action. Second, Axiom Defendants argue that the May 2022 transfer prevents Plaintiffs from asserting a legally cognizable claim against Axiom Defendants. Because "[j]urisdiction is a threshold question that a federal court must address before reaching the merits, even if the merits question is more easily resolved," the Court begins with the Article III standing argument.[15]

### *1. Article III Standing*

Article III standing is central to the Court's limited subject matter jurisdiction; without standing, this Court cannot hear a plaintiff's case.[16] To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[17] Plaintiffs bear the burden to show standing exists.[18]

Axiom Defendants challenge only the second element of jurisdictional standing: whether Plaintiffs' injuries are fairly traceable to Axiom Defendants. This element requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court."[19] A plaintiff cannot show that an

---

[15] *United States v. Springer*, 875 F.3d 968, 973 (10th Cir. 2017) (quoting *Payton v. U.S. Dep't of Agric.*, 337 F.2d 1163, 1167 (10th Cir. 2003)).

[16] U.S. CONST. art. III, § 2; *United States v. McVeigh*, 106 F.3d 325, 334 (10th Cir. 1997).

[17] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[18] *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

[19] *Lujan*, 504 U.S. at 560 (internal quotation marks, alterations, and citation omitted).

injury is "fairly traceable" by alleging "a speculative chain of possibilities."[20] Axiom Defendants contend that Plaintiffs lack Article III standing because the FAC only fairly alleges injuries occurring after the May 2022 transfer. They reason that no cause of action can be sustained against them as they did not own or control Aspen Place when Plaintiffs suffered their injuries, and therefore they owe no legal duty to Plaintiffs.

First, Axiom Defendants suggest that, at the pleading stage, "there must be *proof* of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[21] This requirement of "proof," however, applies at summary judgment.[22] Less is required of a plaintiff at the pleading stage than at summary judgment, including for matters involving Article III standing.[23] A plaintiff at the pleading stage need only "*allege* 'a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.'"[24]

Here, Plaintiffs meet their burden to plead Article III standing for most Counts.[25] The structures at Aspen Place were built in 1954. Though Plaintiffs do not state how long Axiom Defendants owned and managed Aspen Place, KDR Defendants owned and managed Aspen Place for only three years after Axiom Defendants before it was condemned. Given its age as well as the sheer extent and ultimate fallout from the water-related problems at Aspen Place, this Court finds it plausible that these problems were caused by both the alleged neglect of KDR Defendants

---

[20] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (citation omitted).

[21] Doc. 35 at 5 (emphasis added) (citing *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)).

[22] *See Nova Health Sys.*, 416 F.3d at 1154, 1156 (reviewing the standing issue at summary judgment).

[23] *See Whale Fam. Invs., LP v. Concord01, LLC*, 2025 WL 752340, at *3 (10th Cir. Mar. 10, 2025) ("At the pleading stage, plaintiffs' burden to show the fairly traceable element of standing is fairly modest." (quotation marks and citation omitted)).

[24] *See Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 814 (10th Cir. 2021) (emphasis added) (quoting *Nova Health Sys.*, 416 F.3d at 1156). In this case, the Tenth Circuit notably quotes the same opinion cited by Axiom Defendants in their Motion yet excludes the word "proof" in the motion to dismiss context. *Id.*

[25] Because jurisdiction is a threshold matter, this finding has no effect on the merits of Plaintiffs' pleading for Rule 12(b)(6) purposes, which is discussed in greater detail in the following subsection of this Order.

and Axiom Defendants. Any alleged neglect by KDR Defendants after their purchase of Aspen Place would not interrupt the "but for" causation of the alleged neglect of Axiom Defendants during their ownership for purposes of Article III standing.[26]

It is true that the maintenance issues cited in the FAC occurred after the May 2022 transfer when Axiom Defendants no longer owned or managed Aspen Place. But Axiom Defendants' argument conflates jurisdictional standing and statutory standing.[27] A plaintiff may satisfy the requirements of constitutional standing while failing to satisfy the requirements of statutory standing, and "jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which [a plaintiff] could actually recover."[28] Whether the law no longer recognizes a duty owed by Axiom Defendants to Plaintiffs or whether Axiom Defendants lack proximate cause due to KDR Defendants' subsequent ownership does not impact whether these injuries are "fairly traceable" to Axiom Defendants for Article III standing purposes.[29] Mere "but for" causation is all that is required, and the Court finds that the FAC plausibly pleads this connection.[30] As explained above, the temporal connection between the maintenance issues and Axiom Defendants' ownership and management of Aspen Place satisfies the "fairly traceable" element.

---

[26] *See Santa Fe All. for Pub. Health & Safety*, 993 F.3d at 814.

[27] *Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 409 (5th Cir. 2008) ("The question of whether or not a particular cause of action authorizes an injured plaintiff to sue is a merits question, affecting statutory standing, not a jurisdictional question, affecting constitutional standing.").

[28] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (alterations omitted) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

[29] *See Santa Fe All. for Pub. Health & Safety*, 993 F.3d at 814 ("This showing, however, does not require a plaintiff to establish that the defendant was the proximate cause of its injury. Nor does it require a showing that a defendant's actions were the very last step in the chain of causation." (quotation marks and citations omitted)).

[30] *Id.*

Even so, the FAC does not satisfy this element for *all* injuries sustained by Plaintiffs with respect to Axiom Defendants' conduct. Instead of allocating claims between different Defendants, many counts in the FAC broadly attribute all actions taken by any single Defendant to all Defendants. For instance, Count V is brought against "all Defendants" and lists "Defendants' violations of the KCPA."[31] However, based on the facts alleged in the FAC, these injuries are only fairly traceable to KDR Defendants. Injuries suffered by Plaintiffs as a result of KDR Defendants' allegedly deceptive insurance and utility-related billing practices are not fairly traceable to Axiom Defendants.[32] KDR Defendants' alleged retaliation against Plaintiff Rachel Fellows is not fairly traceable to Axiom Defendants. KDR Defendants' allegedly unlawful lease provisions are not fairly traceable to Axiom Defendants. KDR Defendants' alleged manipulation and coercion of falsely positive online reviews are not fairly traceable to Axiom Defendants. In fact, Plaintiffs fail to mention any conduct by Axiom Defendants that fairly alleges willful concealment, false representation, or any of the KCPA violations that Plaintiffs rattle off. The only concealment by Axiom Defendants that the FAC alleges involves the sale of Aspen Place to KDR Defendants, arguing that Axiom Defendants concealed maintenance defects during this sale. Yet this injury would not be borne by Plaintiffs, but rather by KDR Defendants.[33] Therefore, the KCPA claims against Axiom Defendants are conclusory statements that cannot satisfy Rule 12(b)(1). Accordingly, this Court dismisses Count V as alleged against Axiom Defendants.

As for Count VIII—breach of contract for failure to maintain the water infrastructure—the alleged injuries suffered by Plaintiffs following the May 2022 transfer are also not fairly traceable

---

[31] Doc. 34 at 32–34.

[32] Despite what they allege in the FAC, Plaintiffs' Response acknowledge that they "have no reason to believe that Axiom [Defendants], unlike KDR [Defendants], implemented highly deceptive insurance and utility-related billing practices." Doc. 47 at 5.

[33] *See Spokeo, Inc.*, 578 U.S.at 338 (requiring a plaintiff suffer an injury in fact to have Article III standing).

to Axiom Defendants. Any alleged breach for failing to make repairs following the May 2022 transfer involved an active lease agreement that Axiom Defendants were not parties to.[34] While the neglect of Aspen Place may be fairly traceable to Axiom Defendants for purposes of Article III standing, any injury arising from a breach of contract occurring after the May 2022 transfer can only be fairly traceable to KDR Defendants' conduct. Going forward, the Court only considers those injuries in Count VIII that are "fairly traceable" to Axiom Defendants' conduct.

*2. Failure to State a Claim*

Axiom Defendants next contend that Plaintiffs fail to state any legally cognizable claim against them under Rule 12(b)(6). Because the Court dismisses Count V under Rule 12(b)(1), the Court considers the Rule 12(b)(6) argument with respect to the following counts: violations of the warranty of habitability (Count I); breach of contract and breach of the duty to materially comply with the lease and provide habitable housing pursuant to § 58-2559(b) (Count II); breach of the duty to provide essential services pursuant to § 58-2563 (Count III); negligence for failure to maintain the water systems (Count VI); and breach of contract for failure to maintain water infrastructure (Count VIII). For the following reasons, this Court dismisses these Counts as alleged against Axiom Defendants.

The main crux of Axiom Defendants' argument for dismissing these Counts rests on the May 2022 transfer. Axiom Defendants argue that all claims levied against them fail because they were not the landlords at Aspen Place when Plaintiffs experienced the water-related maintenance issues. Implicit in this argument, then, is that Plaintiffs fail to plead that any water-related maintenance issues occurred prior to the May 2022 transfer.

[34] *See Certon Software, Inc. v. EaglePicher Techs., LLC*, 2020 WL 5846469, at *5 (W.D. Mo. Sep. 8, 2020) (finding that the plaintiff's injury based on a breach of contract was not fairly traceable to a defendant who was "not a party" to the contract), *aff'd sub nom.*, 4 F.4th 615 (8th Cir. 2021).

The Court agrees. The FAC broadly alleges that "the complex presented major plumbing problems well before 2022" but offers no specific allegations to satisfy the Rule 12(b)(6) standard.[35] Plaintiffs provide no examples of maintenance issues occurring before the May 2022 transfer and instead suggest that the sale of Aspen Place itself somehow evidences the existence of maintenance issues during Axiom Defendants' ownership and management. This is the type of speculation the Rule 12(b)(6) standard is concerned with.[36] In their Response to Axiom Defendants' Motion, Plaintiffs confirm that "the 'long-running' plumbing issues ostensibly began to manifest more fully in late 2023 and crested in May 2025," after the transfer of ownership and management to KDR Defendants.[37] Therefore, Plaintiffs' FAC fails to allege sufficient allegations that "major plumbing problems" occurred before the May 2022 transfer.

Focusing on the "major plumbing problems" occurring after the May 2022 transfer, the Court finds that Plaintiffs' claims against Axiom Defendants should be dismissed due to Axiom Defendants' transfer of ownership and management. These claims require the existence of a rental agreement between Plaintiffs and Axiom Defendants to establish liability. "A rental agreement is a contract between the landlord and tenant that includes—either implicitly or explicitly—the requirements of the RLTA."[38] Section 58-2554 of the RLTA provides:

> (a) Unless otherwise agreed, a landlord, who conveys premises that include a dwelling unit subject to a rental agreement in a good faith sale to a bona fide purchaser, *is relieved of liability under the rental agreement and this act as to events occurring subsequent to written notice to the tenant of the conveyance*. However, such landlord remains liable to the tenant for any portion of a security deposit to which the tenant is entitled under K.S.A. 58-2550.

[35] Doc. 34 at 15, ¶ 74.

[36] *See Robbins*, 519 F.3d at 1247 ("The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.").

[37] Doc. 47 at 4.

[38] *Washburn S. Apartments LLC v. Hession*, 65 Kan. App. 2d 626, 570 P.3d 1268, 1276 (2025) (citing K.S.A. § 58-2547(a)).

> (b) Unless otherwise agreed, a manager of premises that include a dwelling unit *is relieved of liability under the rental agreement and this act as to events occurring after written notice to the tenant of the termination of such manager's management*.[39]

Here, Axiom Defendants conveyed Aspen Place and transferred management, relieving them from liability based on the rental agreement and the RLTA.[40] By the time Plaintiffs experienced any injuries with respect to the water-related issues at Aspen Place, they no longer had active lease agreements with Axiom Defendants. Section 58-2554 thus relieves Axiom Defendants from liability for the water-related issues referenced in Plaintiff's FAC. Plaintiffs do not plead the existence of an alternative agreement or promise holding Axiom Defendants responsible for events subsequent the May 2022 transfer. Therefore, with respect the water-related maintenance issues after the May 2022 transfer, Plaintiffs fail to allege a plausible claim based on the lease agreements with Axiom Defendants or the RLTA.

Of course, this does not address the entirety of Plaintiffs' theory for relief. Plaintiffs suggest that the alleged latent defects in the plumbing systems during Axiom Defendants' ownership breached their lease agreements with Axiom Defendants and violated the RLTA despite not manifesting into active maintenance issues until later. Axiom Defendants' alleged failure to address this deterioration occurred before the conveyance of Aspen Place. Thus, Plaintiffs argue that Kansas law recognizes a cause of action for deterioration without the existence of active maintenance issues during the term of the lease agreement.

Before addressing the merits of this argument, the Court finds it cannot prevail with respect to Plaintiff Cooperwood. The FAC states he entered his tenancy after the May 2022 transfer and does not allege that he had any dealings or interactions with Axiom Defendants. Thus, the Court

---

[39] K.S.A. § 58-2554 (emphases added).

[40] *See id.*

analyzes Plaintiffs' theory with respect to the remaining Counts below as applied to Plaintiffs Anthony and Rachel Fellows.

a. Counts I and II: The Warranty of Habitability and § 58-2559(b)

The Court finds that Plaintiffs' implied warranty of habitability and § 58-2559(b) claims should be dismissed. Section 58-2559(b) allows a tenant to recover damages "for any noncompliance by the landlord with the rental agreement or K.S.A. 58-2553."[41] Plaintiffs allege that the failure to provide water violated "germane rental agreements," but, as repeatedly established above, Axiom Defendants provided water services to Plaintiffs during their respective lease periods as no water-related issues manifested until late 2023. Thus, Plaintiffs only remaining argument under § 58-2559(b) rests on whether § 58-2553(a)(1) recognizes a claim against Axiom Defendants for simply allowing the water and plumbing systems to deteriorate absent the manifestation of active issues. Because § 58-2553(a)(1) and the implied warranty of habitability effectively hold landlords to the same duty, the same analysis applies to both Counts, and the Court considers them simultaneously.[42]

Section § 58-2553(a)(1) states that a landlord shall "[c]omply with the requirements of applicable building and housing codes materially affecting health and safety."[43] The Kansas Court of Appeals' decision in *Joe v. Spangler*[44] offers insight into how this subsection is to be interpreted.

[41] § 58-2559(b).

[42] *Compare* § 58-2553(a)(1) (stating that a landlord should "[c]omply with the requirements of applicable building and housing codes materially affecting health and safety"), *with Steele v. Latimer*, 214 Kan. 329, 521 P.2d 304, 309 (1974) ("Building codes are common today in many urban centers throughout the United States and the modern weight of authority in this country appears to be that the minimum standards embraced within a housing ordinance, building code or other municipal regulation are to be read into and will be implied by operation of law in housing contracts."); *see also Jackson by Jackson v. Wood*, 11 Kan. App. 2d 478, 726 P.2d 796, 800 (1986) (commenting that "*Steele* and K.S.A. 58–2553(a)(1) define minimum standards for rental housing which are read into and become part of the lease").

[43] § 58-2553(a)(1).

[44] 6 Kan. App. 2d 630, 631 P.3d 1243 (1981).

In *Joe*, the court considered whether exposed electrical wiring and loose, uncovered outlets breached a landlord's duty under § 58-2553(a)(1).[45] Because applicable housing codes prohibited these conditions in order to "prevent[] accidental electrocution and fires," the court concluded that these conditions violated subsection (a)(1).[46] Notably, *Joe* did not state that any fires or electrocutions occurred; rather, these conditions presented a danger to the tenants simply due to the risk they posed.[47] Thus, following this rationale, § 58-2553(a)(1) requires landlords to do more than respond to code violations already causing damage or harm; it also requires landlords to address code violations designed to prevent danger that would materially affect health and safety.

However, Plaintiffs fail to allege that Axiom Defendants violated any specific codes materially affecting health and safety. Instead, they state that "Defendants . . . have violated Kansas law many times over," never specifying which Defendants they are referring to or the specific law or codes that were violated.[48] It is certainly plausible that the water and plumbing systems at Aspen Place started deteriorating during Axiom Defendants' ownership and management given Aspen Place's age and its fate after the May 2022 transfer. And safe drinking water and sanitary plumbing conditions are unquestionably material to health and safety.[49] This Court, however, cannot analyze whether Axiom Defendants violated any codes materially addressing health and safety because the FAC does not identify any codes.

Thus, Plaintiffs fail to state a claim in Counts I and II, and they are dismissed accordingly as alleged against Axiom Defendants.

---

[45] *Id.* at 1245.

[46] *Id.*

[47] *Id.* at 1244–45.

[48] Doc. 34 at 26, ¶ 123.

[49] *See Joe*, 631 P.3d at 1244–45.

b. Count III: § 58-2563 Claim for Failure to Provide Essential Services

The Court finds that Count III should be dismissed. The plain language of § 58-2563 requires that services be "interrupt[ed]" by the landlord to trigger a violation of the statute.[50] During the time that Axiom Defendants managed and owned Aspen Place, Plaintiffs never allege that services were interrupted.

Thus, Plaintiffs fail to plead that Axiom Defendants violated § 58-2563, and Count III is dismissed accordingly.

c. Count VI: Negligence

The Court finds that Count VI should be dismissed. Plaintiffs argue Axiom Defendants breached duties owed to them by failing to inspect, maintain, prevent, and repair the maintenance issues at Aspen Place. Axiom Defendants argue that they cannot be held liable for failing to maintain the water systems because Plaintiffs were not injured during their lease periods with Axiom Defendants—they were only injured after the May 2022 transfer when no lease agreement existed between them. This dispute follows from the discussion above regarding § 58-2554's relief of liability for those duties arising from the RLTA and lease agreement. This dispute also raises the question of whether Kansas law recognizes an independent duty arising from a tort claim separate from these contractual duties.

The duties Axiom Defendants allegedly breached all arise from their lease agreements or the RLTA. "In Kansas, the economic loss doctrine *bars tort claims* when the duty [a p]laintiff claims was violated is duplicative of a duty that arises in contract."[51] Because the duties alleged

[50] § 58-2563 (providing a tenant a cause of action "[i]f the landlord . . . willfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water, or other essential service to the tenant").

[51] *Culp v. Sentinel Real Est. Corp.*, 2026 WL 2056012, at *9 (D. Kan. July 16, 2026) (emphasis added) (citing *David v. Hett*, 293 Kan. 679, 270 P.3d 1102, 1114 (2011)) (applying the economic loss doctrine in a landlord-tenant dispute).

in Count VI would not exist absent the lease agreements between Axiom Defendants and Plaintiffs, Plaintiffs' negligence claim "must sound in contract."[52] Based on the pleaded facts, there is no independent duty that applies to Axiom Defendants outside of the RLTA or lease agreement that can support a negligence action after the May 2022 transfer.

Thus, the Court dismisses Count VI as alleged against Axiom Defendants.

d. Count VIII: Breach of Contract for Failure to Maintain Water Infrastructure

The Court finds that Count VIII should be dismissed. As stated above, the Court will not address alleged breaches occurring after the May 2022 transfer for failing to be fairly traceable to Axiom Defendants under Rule 12(b)(1). However, those claims that survived Rule 12(b)(1) above do not survive here under Rule 12(b)(6).

Count VIII, as alleged, is entirely specific to KDR Defendants yet entirely nonspecific to Axiom Defendants. Plaintiffs provide quoted portions of lease agreements with KDR Defendants but mention in parentheticals that there were "substantially similar provisions in lease agreements executed by the Axiom Defendants."[53] Plaintiffs list a litany of defects in the water and plumbing systems at Aspen Place yet, as already discussed above, fail to cite any instances that occurred before the May 2022 transfer. Plaintiffs offer no instances of conduct specific to Axiom Defendants and instead, as they do in many Counts in the FAC, broadly refer to "Defendants" throughout. Any specific instances cited, however, are clearly attributable only to KDR Defendants and not Axiom Defendants. This does not satisfy Rule 12(b)(6) with respect to claims against Axiom Defendants.

The Court, therefore, dismisses Count VIII as alleged against Axiom Defendants.

---

[52] *See id.*

[53] Doc. 34 at 45, ¶ 223.

### B. KDR Defendants' Partial Motion to Dismiss

KDR Defendants move to dismiss the following claims under Rule 12(b)(6): breach of the warranty of habitability (Count I); failure to provide essential services under § 58-2563 (Count III); constructive eviction (Count IV); and violations of the KCPA (Count V). For the following reasons, the Court dismisses Counts I, III, and IV and denies KDR Defendants' Motion with respect to Count V.

#### *1. Count I: Implied Warranty of Habitability*

KDR Defendants seek to dismiss Count I by arguing that Kansas law does not recognize separate causes of action for the implied warranty of habitability in Count I and the RLTA violations in Count II. Specifically, KDR Defendants argue that the implied warranty of habitability merely augments claims brought under § 58-2553 and 2559, the provisions of the RLTA supporting Count II. Plaintiffs disagree.

The Court is persuaded by an unpublished Kansas Court of Appeals decision, *Claus v. Deware Enterprises, L.L.C.*[54] There, the court rejected the notion that prior Kansas caselaw in *Steele v. Latimer*,[55] "create[ed] a cause of action which is somehow separate and distinct from a cause of action based upon a written leased or upon the RLTA."[56] The court went on to hold:

> When [the tenant] sued for breach of contract, the cause of action necessarily involved the entire contract. *There was no parallel cause of action based upon that portion of the contract supplied by the common law. The district court was not required to separately analyze the implied warranty of habitability and the provisions of the RLTA*. Rather, both were germane to the minimum housing standards which are necessarily read into the lease agreement as a contractual obligation of [the landlord].[57]

---

[54] 2006 WL 1816406 (Kan. Ct. App. 2006).

[55] 214 Kan. 329, 521 P.2d 304, 309 (1974).

[56] *Claus*, 2006 WL 1816406 at *3 (interpreting *Steele*, 521 P.2d 304).

[57] *Id.* (emphasis added).

This rationale is supported by *Steele* itself, which did not recognize a separate common law cause of action but instead held that a breach of the implied warranty of habitability is a breach of contract.[58] Thus, the implied warranty of habitability and the RLTA merely offer complimentary, but not separate, theories regarding a landlord's failure to provide a habitable premises.[59]

Here, the allegations in Counts I and II address the same conduct by KDR Defendants. Therefore, Counts I and II attempt to bring two causes of action for the same conduct breaching the lease agreement. This is the exact situation rejected by *Claus*, as there can be no "parallel claim" based on the same conduct between the implied warranty of habitability and the RLTA.[60] Because this does not comport with Kansas law, only one Count may go forward. Consequently, the Court dismisses Count I.

*2. Count III: § 58-2563 Claim for Failure to Provide Essential Services*

KDR Defendants seek to dismiss Count III, which alleges that KDR Defendants failed to provide essential services pursuant to § 58-2563 of the RLTA. The relevant language of § 58-2563 states as follows:

> If the landlord unlawfully removes or excludes the tenant from the premises or *willfully diminishes services to the tenant by interrupting or causing the*

[58] *See Steele*, 521 P.2d at 309–10 ("Under familiar legal principles the provisions of the city's housing code relating to minimum housing standards were *by implication read into and became a part of the rental agreement* between [tenant] and [landlord]." (emphasis added)).

[59] Plaintiffs' only counterargument misunderstands the analysis in *Claus*. Plaintiff suggests that because the RLTA does not abrogate *Steele*, the implied warranty of habitability and the RLTA can support separate causes of action. However, this simply indicates that the principles discussed in *Steele* are not repealed by the RLTA; it does not indicate an independent cause of action under the implied warranty. Instead, both *Steele* and the RLTA offer bases by which parties may allege their landlord has breached their lease agreement. *See Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 771 P.2d 79, 83 (1989) ("If [a landlord] has failed to comply with its statutory duties under K.S.A. 58-2553, it has *breached its contract* with [the tenant], and [the tenant] is entitled to the traditional remedies for breach of contract, including recovery of damages." (emphasis added)); *Washburn S. Apartments LLC*, 570 P.3d at 1275 ("Kansas courts have long recognized that a tenant who claims a landlord has breached its duty to provide habitable housing raises a *contractual breach-of-warranty claim* and may recover damages suffered due to the breach." (emphasis added)). But just because both the implied warranty of habitability and the RLTA can establish a landlord's breach of contract, it does not mean that they can be used independently to support two separate causes of action for a breach of contract involving the same conduct.

[60] *Claus*, 2006 WL 1816406, at *3.

> *interruption of electric, gas, water or other essential service to the tenant*, the tenant may recover possession or terminate the rental agreement and, in either case, recover an amount not more than one and one-half (1½) months' periodic rent or the damages sustained by the tenant, whichever is greater.[61]

Section 58-2563 is thus primarily concerned with two courses of conduct: (1) unlawfully removing or excluding a tenant from the leased premises, or (2) willfully diminishing services to the tenant.[62] Here, Plaintiffs allege KDR Defendants engaged in the latter.

The parties' dispute hinges on the interpretation of two phrases: "interrupting or causing the interruption of" and "willfully diminishes." KDR Defendants posit that the statute requires a landlord engage in "deliberate interference" or, in other words, "affirmative conduct" to apply.[63] KDR Defendants claim they did not engage in affirmative conduct that caused the water-related issues at Aspen Place. Plaintiffs do not dispute this. Instead, Plaintiffs argue that § 58-2563 can be violated through a landlord's inaction in failing to repair or maintain a premises, emphasizing the broadness of "causing" and arguing that "willful" contemplates "gross negligence."[64] Thus, the resolution of this issue is a matter of statutory interpretation and construction.

"As this Court is construing a Kansas statute, it must be given the meaning it would have in the Kansas courts."[65] However, neither party provides Kansas caselaw interpreting § 58-2563, and the Court's research revealed none. "The Court must therefore attempt to predict the interpretation that would be given the statute by the Kansas courts, 'based on its language, on the decisions of other state appellate courts, and on the evident purposes of the statute.'"[66]

---

[61] K.S.A. § 58-2563 (emphasis added).

[62] *Id.*

[63] Doc. 36 at 5.

[64] Doc. 46 at 12–15.

[65] *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 985 (D. Kan. 2018) (citing *Williams v. United Parcel Serv., Inc.*, 527 F.3d 1135, 1140 (10th Cir. 2008)).

[66] *Id.* (quoting *Williams*, 527 F.3d at 1140).

Under Kansas law, "[t]he guiding principle of statutory interpretation is to give effect to the Legislature's intent whenever that intent can be determined. To discern that intent, [this] analysis begins with the statute's plain language, interpreting words according to their ordinary meaning."[67] "Dictionary definitions are good sources for the ordinary, contemporary, common meanings of words."[68] Of course, where a term has a technical, legal meaning, other legal authorities may be properly consulted.[69] Additionally, courts may consider prior caselaw interpreting similar statutes.[70] "It is only when 'the language is less than clear or is ambiguous' that the court should 'move to statutory construction and use the canons of construction and legislative history and other background considerations to divine the legislature's intent.'"[71] With these principles in mind, the Court turns to the relevant statutory language of § 58-2563.

a. "Interrupting or Causing the Interruption of"

This Court agrees with Plaintiffs that the language "interrupting or causing the interruption of" is broad enough to incorporate a landlord's failure to repair an ongoing maintenance issue which interrupts an essential service.

First turning to the text itself, "interrupting or causing the interruption of" is a disjunctive phrase providing two alternative gerunds by which a landlord may trigger § 58-2563:

---

[67] *State v. Evans*, 322 Kan. 1, 584 P.3d 646, 649 (2026).

[68] *Midwest Crane & Rigging, LLC v. Kan. Corp. Comm'n*, 306 Kan. 845, 397 P.3d 1205, 1209 (2017) (internal quotation marks omitted); *see also Coe v. Sec. Nat'l Ins. Co.*, 228 Kan. 624, 620 P.2d 1108, 1112–13 (1980) ("In construing a statute, words and phrases should be construed according to context and the approved usage of the language, and words in common use are to be given their natural and ordinary meaning.").

[69] *See Matter of Spangler*, 318 Kan. 697, 547 P.3d 516, 520 (2024) (citing *State v. Arnett*, 307 Kan. 648, 413 P.3d 787, 791–92 (2018); *Midwest Crane & Rigging, LLC*, 397 P.3d at 1209) ("If the Legislature includes no definitions, we look to dictionaries for the ordinary, contemporary, and common meaning of words, although we might also look to other legal authorities when examining the meaning of words with a technical, legal meaning.").

[70] *See J.A. Tobin Const. Co. v. Kemp*, 239 Kan. 430, 721 P.2d 278, 283 (1986) (considering the "prior decisions of [the Kansas Supreme Court] interpreting similar statutes" to interpret a statute); *Midwest Crane & Rigging, LLC*, 397 P.3d at 1210 (referencing caselaw to support a statutory construction determination).

[71] *Midwest Crane & Rigging, LLC*, 397 P.3d at 1209 (quoting *Ambrosier v. Brownback*, 304 Kan. 907, 375 P.3d 1007 (2016)).

"interrupting" and "causing."[72] Because courts do not read statutes as having redundancy, "interrupting" and "causing the interruption of" should be read with independent meanings.[73] This Court reads "interrupting" as contemplating affirmative conduct. To avoid redundancy, the Court reads "causing the interruption of" more expansively, finding it contemplates other forms of conduct proximately causing the interruption of essential services such as non-affirmative conduct. This reading is supported by the definition of "cause," as Black's Law Dictionary defined "cause" broadly at the time § 58-2563 was enacted.[74]

Second, Kansas caselaw supports the Court's interpretation. Kansas courts have looked to common law understandings of causation when interpreting the term "cause" in other Kansas statutes.[75] "In both the criminal and civil context, [courts] routinely require a showing of causation to demonstrate that one thing was the proximate cause of another."[76] "To establish that one thing proximately caused another, a party must prove two elements: cause-in-fact and legal causation. Together, these elements limit a defendant's liability to 'those consequences that are *probable* according to ordinary and usual experience.'"[77] As various cases examining proximate cause have established, an individual's failure to act can establish the proximate cause of an injury.[78] Kansas

---

[72] *See State v. Bee*, 288 Kan. 733, 207 P.3d 244, 250 (2009) ("The word 'or' is generally to be read as a disjunctive rather than a conjunctive.").

[73] *See Citizens Bank, N.A. v. Gaskins*, 65 Kan. App. 2d 447, 567 P.3d 891, 898 (2025) ("We 'presume that the legislature does not use redundant language, and we try to give meaning to every word in the statute.'" (quoting *Wing v. City of Edwardsville*, 51 Kan. App. 2d 58, 341 P.3d 607, 612 (2014))).

[74] *Cause*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968) ("To be the cause or occasion of; to effect as an agent; to bring about; to bring into existence; to make.").

[75] *Arnett*, 413 P.3d at 791–92 ("[T]his court has considered liability based on a theory of causation in other contexts many times. Because our lawmakers adopted the restitution statute against this backdrop, we find the caselaw informative.").

[76] *Id.*

[77] *Id.* (quoting *Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 290 Kan. 406, 228 P.3d 1048, 1060 (2010)).

[78] *See, e.g.*, *Williams v. Davis*, 188 Kan. 385, 362 P.2d 641, 645 (1961) (recognizing an alleged cause of action for injuries suffered by a child caused by a landlord's failure to repair a porch banister).

caselaw interprets the RLTA to impose a duty to repair on a landlord in certain contexts.[79] Therefore, a landlord's failure to repair or maintain a premises may proximately "caus[e] the interruption of" services as contemplated by § 58-2563's text.

Finally, KDR Defendants' reliance on *Geiger v. Wallace*[80] is misplaced. In *Geiger*, the court found that the landlord's actions of "nail[ing] the door shut from the inside and turn[ing] off the electricity" supported that he had unlawfully excluded the tenants and willfully diminished services.[81] KDR Defendants assert this holding demonstrates that § 58-2563 requires affirmative conduct. However, *Geiger* did not hold that affirmative actions were the only manner by which a landlord may willfully diminish services, nor did it address whether a landlord's failure to maintain or repair falls within the language of § 58-2563.[82] A landlord could easily diminish services to a tenant by choosing not to repair an active maintenance issue that would foreseeably cause the interruption of essential services. Consequently, this Court will not read § 58-2563 in such a manner as to allow a landlord to take advantage of a maintenance issue by failing to repair it.

b. "Willfully Diminishes"

While this Court agrees with Plaintiffs that a landlord's inaction may cause the interruption of services, it disagrees with Plaintiffs' interpretation of "willfully." "Willfully" is not a plain term and can be subject to different meanings; thus, statutory construction rather than statutory interpretation is necessary. "It is a well recognized rule of statutory construction used to determine

---

[79] *Jackson by Jackson*, 726 P.2d at 800 (holding that "if the landlord knew or reasonably should have known of a defective condition . . . then the landlord owed a duty of reasonable care to repair").

[80] 233 Kan. 656, 664 P.2d 846 (1983).

[81] *Id.* at 849 ("[T]he only *real* fact question presented to the trial court was the amount of damages which should be awarded" (emphasis added)). As stated above, the Court has not discovered any caselaw that actually interprets or construes the disputed language of § 58-2563.

[82] *See generally id.* (making no reference to a landlord's failure to act, repair, or remedy an ongoing maintenance issue).

legislative intent that ordinarily identical words or terms used in different statutes on a specific subject are interpreted to have the same meaning in the absence of anything in the context to indicate that a different meaning was intended."[83]

"Willful" is not defined by the RLTA. However, in *Heckard v. Martin*,[84] the Kansas Court of Appeals applied the standard legal definition of "willful conduct" to interpret "willful" as it appeared in § 58-2570(c) of the RLTA.[85] In Kansas, "[f]or purpose of civil actions, 'willful conduct' has been defined as '[a]n act performed with a *designed purpose or intent* on the part of a person to do wrong or to cause an injury to another.'"[86] Thus, as observed by other courts interpreting Kansas law, it is not enough that an act be intentional for it to be "willful"; the consequences of the act must also be intentional.[87]

Though *Heckard*'s interpretation of § 58-2570(c) involved willful conduct of a tenant, the analysis remains applicable to willful conduct of a landlord for purposes of interpreting § 58-2563.[88] Thus, to trigger the language of § 58-2563, it is not enough that a landlord intentionally chooses not to repair or maintain the premises; he must further intend that his inaction results in the diminution of essential services.[89] This distinction is subtle but imperative to understanding the scope of intent that may trigger the statute's language.

---

[83] *Cent. State Bank v. Albright*, 12 Kan. App. 2d 175, 737 P.2d 65, 68 (1987).

[84] 25 Kan. App. 2d 162, 958 P.2d 665 (1988).

[85] *Id.* at 667.

[86] *Id.* (emphasis added) (quoting Kan. PIK Civ. 3d 103.04).

[87] *See Klepper v. Milford*, 825 F.2d 1440, 1447 (10th Cir. 1987) (citing *Bowman v. Doherty*, 235 Kan. 870, 686 P.2d 112, 118 (1984)) (reasoning that "willful failure to guard" in the Kansas Recreational Use Statute required establishing that the "defendants intended to injure the plaintiff or otherwise had a designed purpose or intent to do wrong").

[88] *See Heckard*, 958 P.2d at 667; *State ex rel. Brant v. Bank of Am.*, 272 Kan. 182, 31 P.3d 952, 957 (2001) ("Ordinarily, when determining legislative intent, identical words or terms used in different statutes on a specific subject are interpreted to have the same meaning absent anything in the context to suggest that a different meaning was intended.").

[89] *See* K.S.A. § 55-2263; *Heckard*, 958 P.2d at 667.

Missing this subtlety, Plaintiffs argue that a "willful" mindset "may be evidenced by gross negligence or reckless indifference to known harms."[90] This misreads Kansas law. The Kansas Supreme Court has drawn the following distinction between willful and wanton conduct:

> Willful conduct is action indicating a design, purpose or intent on the part of a person to do wrong or to cause an injury to another. . . . Wanton conduct is action indicating a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the action.[91]

Based on this juxtaposition, the term "willful" requires something more than gross negligence or reckless indifference.[92]

Other provisions of the RLTA further support that mere inaction absent the intent that it result in the diminution of essential services is not contemplated by § 58-2563. As explained by the Kansas Supreme Court:

> In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.[93]

Sections 58-2559(b) and 2553 of the RLTA already provide a cause of action for tenants when a landlord fails to provide necessary services such as adequate water and plumbing.[94] These provisions do not require that such failures be "willful." Section 58-2563, thus, cannot be read so

[90] Doc. 46 at 14.

[91] *Anderson v. White*, 210 Kan. 18, 499 P.2d 1056, 1058 (1972); *see also Muir v. Cleveland Univ.-Kan. City*, 590 P.3d 381 (Table), 2026 WL 1362140, at *11 (Kan. Ct. App. May 15, 2026) (commenting favorably on the definitions that distinguished between "willful" and "wanton" in *Anderson v. White*).

[92] *See Vaughn v. Murray*, 214 Kan. 456, 512 P.2d 262, 267 (1974) ("This is true because a wanton act is something more than ordinary negligence but it is something *less than willful injury*. To constitute wantonness the act must indicate a realization of the imminence of danger and a reckless disregard or a complete indifference or an unconcern for the probable consequences of the wrongful act." (emphasis added)).

[93] *Nat'l Council on Comp. Ins. v. Todd*, 258 Kan. 535, 905 P.2d 114, 118 (1995) (quoting *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331, 334 (1989)).

[94] K.S.A. §§ 58-2553, 58-2559(b).

broadly as to render these provisions redundant. It therefore cannot apply to all acts or omissions that result in the loss of essential services. Based on this context, the purpose of § 58-2563 becomes clear: to punish landlords who *intend* for their actions or inactions to result in the diminution of services to the tenant.[95] It does not seek to punish landlords for reckless indifference to the diminution of services.

Following the analysis above, this Court finds Plaintiffs fail to plead that KDR Defendants willfully diminished essential services. Based on the FAC, maintenance issues persisted for extended periods of time, and KDR Defendants' response to these issues was often less than adequate, ultimately resulting in the diminution of essential services. However, these factual allegations do not support that KDR Defendants had the "designed purpose or intent" that their inadequate maintenance would result in diminution of services.[96] Some allegations support the opposite conclusion. For instance, KDR may have been "exceedingly slow to respond to burst pipes," but they still responded. And though Plaintiffs take issue with its language, the lease agreements' warnings regarding frozen pipes support that KDR Defendants wanted to prevent these issues. Ultimately, because Plaintiffs do not plead any factual allegations that KDR Defendants intended to diminish services, the claims under § 58-2563 cannot go forward.

Accordingly, the Court dismisses Count III.

*3. Count IV: Constructive Eviction Claim*

Count IV alleges that KDR Defendants constructively evicted Plaintiffs by allowing the water and plumbing systems at Aspen Place to fall into disrepair. KDR Defendants argue Plaintiffs

---

[95] This reading is further supported by the text of § 58-2263, which allows a tenant to "recover an amount not more than one and one-half (1 ½) months' periodic rent or the damages sustained by the tenant, whichever is greater." This recovery of greater damages indicates intent to punish a landlord for having the purpose of diminishing services to a tenant.

[96] *See Heckard*, 958 P.2d at 667.

were not constructively evicted because: (1) Plaintiffs did not make repairs during their tenancy at Aspen Place, barring them from damages under an alternative constructive eviction theory and (2) Plaintiffs did not give notice of their decision to vacate and said decision was not made "voluntarily" when Plaintiffs vacated as a result of the condemnation.

In Kansas, "in order to constitute a constructive eviction, the acts complained of must be those of the landlord or those for which he is responsible."[97] "'Constructive eviction' exists where, although there has been no physical expulsion or exclusion of the tenant, the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises."[98] "[U]nder the doctrine of constructive eviction courts have recognized that a tenant need not always remove from the premises to preserve a cause of action against his landlord. The alternative remedy is permitted of making repairs when economically feasible and then suing to recover the cost of said repairs."[99]

Here, Plaintiffs do not allege they made such repairs; therefore, Plaintiffs cannot obtain relief based on this alternative theory of constructive eviction. Additionally, there is no need to take up KDR Defendants' second argument as Plaintiffs fail to allege any damages resulting from the condemnation under their constructive eviction claim. Plaintiffs never make reference to the condemnation order in Count IV's allegations.[100] Instead, they rely entirely on the alternative theory discussed above and highlight that "Kansas law recognizes that tenants may recover damages for constructive eviction even while continuing to occupy the premises."[101] Plaintiffs do

---

[97] *Eagle v. Matthews*, 98 Kan. 715, 160 P. 211, 212 (1916).

[98] 49 Am. Jur. 2d *Landlord and Tenant* § 503.

[99] *Serv. Oil Co. v. White*, 218 Kan. 87, 542 P.2d 652, 661 (1975)

[100] Doc. 34 at 30–31.

[101] *Id.* at 31, ¶ 162.

not bring this action pro se and instead are represented by counsel; thus, the Court finds no reason to construe this Count to argue a theory that is not present on the face of the FAC.[102] Thus, they fail to allege a constructive eviction claim based on the condemnation order.

Accordingly, the Court dismisses Count IV.

*4. Count V: RLTA Preemption of KCPA*

Lastly, Count V alleges numerous KCPA violations against KDR Defendants for deceptive business practices, false representations of the quality of Aspen Place's water system, unconscionable insurance requirements, manipulation of utility bills, and defects in the lease agreements. KDR Defendants argue that these claims should be dismissed because the RLTA preempts the KCPA in accordance with the Kansas Supreme Court's holding in *Chelsea Plaza Homes, Inc. v. Moore*.[103] There, after discussing the interplay between these acts, the court held that "for all transactions within its purview the [RLTA] controls and preempts the field."[104] Thus, where the RLTA controls, the KCPA is preempted.

At the outset, much of Count V fails to state a claim as various KCPA violations brought by Plaintiffs are based on the lease agreements or aspects of the landlord-tenant relationship. The

---

[102] Even if it addressed the merits of the condemnation argument, the Court is not convinced that Kansas law supports Plaintiffs' contention. The Court has found cases in other jurisdictions finding a constructive eviction where a tenant vacated as a result of a condemnation. *See Dennison v. Marlowe*, 744 P.2d 906, 910 (N.M. 1987) (finding constructive eviction where "lessees were denied the use of the second floor because the State Fire Marshal had demanded that a sprinkler system be installed"); *Stoiber v. Honeychuck*, 162 Cal. Rptr. 194, 205 (Cal. Ct. App. 1980) ("Appellant has stated a cause of action for constructive eviction. She was forced to abandon the premises after the Kern County Health Department ordered the premises be vacated and destroyed."); *Charles F. Hartmetz Invs., Inc. v. Litty*, 153 N.E.2d 924, 927 (Ind. Ct. App. 1958) (finding that the lessee was constructively evicted after a building was condemned for conditions the lessor refused to repair). Only one of these cases ever addressed whether it was significant that a tenant vacated in compliance of a condemnation order as opposed to her own election. *Litty*, 153 N.E.2d at 927 (highlighting that the tenant was the one who notified the landlord of the condemnation warning and the landlord refused to repair despite the condemnation warning). The Court has not found any other cases supporting Plaintiffs' theory, and Kansas Court of Appeals' decision in *Oswalt* runs against this theory. *Deware Enterprise, LLC v. Oswalt*, 2002 WL 35657629 (Kan. Ct. App. Mar. 8, 2002) (placing emphasis on the phrase "if the tenant so elects and surrenders his possession" (quoting *Constructive eviction*, Black's Law Dictionary (6th ed. 1990))).

[103] 226 Kan. 430, 601 P.2d 1100 (1979).

[104] *Id.* at 1104.

RLTA clearly governs the nature of lease agreements, the terms that may be included within them, and those provisions which cannot be incorporated.[105] It further follows from *Chelsea* that the RLTA preempts the KCPA with respect to the contents of the lease agreement.[106] This is a point that both parties seem to agree on, yet Count V is replete with references to the lease agreements and other actions specific to the landlord-tenant relationship.[107] Therefore, those KCPA claims within Count V that are based on the lease agreements and rental fees are dismissed as preempted by the RLTA.

For the remaining claims, Plaintiffs seek to distinguish *Chelsea* as applied here. First, Plaintiffs argue that the RLTA is specific to the landlord-tenant relationship; thus, the RLTA would not apply to conduct by KDR Realty, LLC, the management company for Aspen Place, not the landlord. Second, Plaintiffs argue that the RLTA preempts only those claims arising out of the lease agreement itself, leaving its KCPA claims arising outside of the lease agreement untouched.

For Plaintiff's first argument, KDR Defendants highlight that the FAC never states which entity—KDR Realty, LLC or KDR AP, LLC—serves as the landlord for the lease agreements with Plaintiffs. In fact, after grouping the two entities together and referring to them collectively as "KDR," the FAC broadly references "KDR" in other Counts pertaining to the lease agreement, such as Count VIII's breach of lease agreement claim. As for management practices, the FAC

[105] *See* K.S.A. §§ 58-2545, 58-2547.

[106] *Chelsea Plaza Homes, Inc.*, 601 P.2d at 1104.

[107] In their Response, Plaintiffs state that that the RLTA "governs lease-based transactions between a residential landlord and tenant," and their "claims for KCPA violations do not derive from affirmative representations in the *lease agreement itself*." Doc. 46 at 4–5 (emphasis added). However, in the FAC, Plaintiffs bring claims against KDR Defendants for: "[r]epresenting through lease agreements that certain transactions conferred rights, remedies, or obligations which they did not have or involve" (¶ 174.e); "[c]omitting unconscionable conduct by charging and collecting rent from tenants when the premises were uninhabitable" (¶ 174.i); implementing "'water usage fees' mid-lease term through adhesive addendums" (¶ 174.k); using "vague, ambiguous, and unconscionable lease terms" (¶ 174.o); "[r]epresenting through lease provisions that tenants waived or disclaimed rights, remedies, or obligations *guaranteed by the Kansas Residential Landlord and Tenant Act*" (¶ 174.p); and so on. Doc. 34 at 33–34 (emphasis added). Contrary to Plaintiff's Response, much of Count V is preempted by the RLTA.

only refers to "KDR's absurdly inadequate property management" without specifying which entity served as the property manager.[108] Plaintiffs only make the distinction between landlord and property manager known in their Response. However, "Plaintiffs cannot amend their complaint by alleging new facts and claims in their response."[109] Because the FAC never defines KDR Realty, LLC's status and, in some instances, treats it as a landlord, Plaintiffs' first argument fails.

As for Plaintiffs' second argument, Plaintiffs contend that the RLTA is narrow in scope, only applying to landlord-tenant transactions pertaining to the lease agreement. Plaintiffs specifically argue that misrepresentations in marketing regarding the water system, failures to disclose deficiencies in the water system, the manipulation of utility bills, and the evasion of insurance responsibilities all fall outside of the RLTA. KDR Defendants counter that Plaintiffs cannot evade RLTA preemption by recharacterizing the habitability issues as misrepresentations in marketing. They further argue that the RLTA covers a landlord's interference with utilities and insurance practices.

The Court partially agrees with KDR Defendants. Presuming that KDR Defendants made promises that the water system would operate properly, the failure to keep said promises would already be addressed by the lease agreement and various RLTA provisions concerning habitability.[110] To the extent Count V is based on these habitability issues, it is dismissed.

But the Court is not convinced that the RLTA addresses a landlord's alleged manipulation and inflation of utility bills or whether certain insurance costs may be passed on to a tenant. KDR Defendants suggest that, because the RLTA addresses a landlord's interference with utilities, the interference with the costs of utilities is also covered by the Act. But there is a difference between

---

[108] Doc. 34 at 11, ¶ 51.

[109] *See Larson v. Safeguard Props., Inc.*, 379 F. Supp. 2d 1149, 1152 (D. Kan. 2005).

[110] *See* K.S.A. §§ 58-2553, 58-2555, 58-2559, 58-2563.

a landlord improperly manipulating the flow of water or electricity and a landlord improperly manipulating the flow of costs.[111] There is also a difference between whether a landlord complies with the terms of the rental agreement and whether terms in the agreement themselves are unlawful pursuant to another act. The RLTA never addresses the manipulation and inflation of utility bills or the insurance expectations of a landlord and tenant. As such, the Court finds these allegations are not preempted by the RLTA.

Thus, Count V must proceed with respect to these specific allegations regarding KDR Defendants' alleged manipulation of utility bills and insurance practices.

**IT IS THEREFORE ORDERED** that Axiom Defendants' Motion to Dismiss (Doc. 35) is **GRANTED**. All remaining Axiom defendants are terminated from the case.

**IT IS FURTHER ORDERED** that KDR Defendants' Partial Motion to Dismiss (Doc. 36) is **GRANTED in part** and **DENIED in part**.

**IT IS SO ORDERED.**

Dated this 8th day of October, 2026.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

[111] *See* § 58-2563 (addressing a landlord's "interruption" of "services," not the manipulation or inflation of utility costs).